[Crim. No. 2512. Fourth Dist., Div. One. Sept. 22, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. LUCILLE MARIE MILLER, Defendant and Appellant.

Holcomb, Kassel & Ward and Edward P. Foley for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

BRAY, J.*—Defendant appeals from judgment of conviction, after jury trial, of murder in the first degree with life imprisonment.

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

## QUESTIONS PRESENTED

1. Sufficiency of the evidence.
2. Alleged misconduct of the district attorney.
 a. Opening statement.
 b. Cross-examination of defendant.
 c. Examination of witness James.
 d. Cross-examination of Priscilla Slagle.
 e. Impeachment of Dr. Ford.
 f. Evidence of bad checks.
 g. Examination of Dr. Modglin.
 h. Examination of witness Nourse.
 i. Argument.
 j. Defendant's attorney's instructions to defendant not to talk.
3. Should prospective jurors opposed to capital punishment have been excused?
4. Admission of evidence.
 a. Search of the Volkswagen.
 b. Testimony of the undercover agent planted in defendant's cell.
 c. The Hayton affair.
 d. Insurance.
 e. Experiments.
5. Instructions.
 a. Manslaughter.
 b. Bad checks.
6. Denial of motion for new trial.
7. Excusing juror No. 5.
8. Denial of motion to dismiss indictment. (Grand jury proceedings.)
9. Publicity.

### 1. SUFFICIENCY OF THE EVIDENCE

The trial was bitterly contested and much of the evidence was conflicting. The case is one of circumstantial evidence substantial enough to support the verdict. We will discuss principally the evidence supporting the verdict.

About 1:45 on the morning of October 8, 1964, defendant came to the door of the home of Mrs. Maurice Swenson in Alta Loma and said, "Help me, help me. My car is on fire. Cork is all burned."[1] Mrs. Swenson invited defendant in and telephoned the sheriff. She then asked defendant if she should call

---

[1] "Cork" was the nickname of defendant's husband, Dr. Gordon E. Miller.

anyone else and defendant asked her to call Harold J. Lance, her attorney. In answer to Mrs. Swenson's call, Lance drove over to her home and was greeted by defendant saying "Cork" was all burned up. While waiting for the sheriff, the three persons talked. Defendant thought she had a bump on her head, but Mrs. Swenson couldn't find one. There was a scent of burned hair on the back of defendant's head. Defendant held a scorched scarf. Her clothes were rumpled, but Mrs. Swenson did not notice any dirt or disarray.

In the meantime, Charles Hogancamp, Chief of the Alta Loma Fire Protection District, had received a fire call and was trying to find the car. He arrived at Mrs. Swenson's house just as Lance and defendant were driving out the driveway. Lance said he was an attorney and suggested that the chief follow him in the fire truck. Defendant seemed uncertain as to the exact location of the burned car. At a point where the road was partially blocked, they saw the car burning. Arriving there, they found the car, a Volkswagen, was burning at the rear around the motor and the rear tires. The door on the left side was wide open. The trunk and the engine lids were closed. There was a body on the seat of the car. Hogancamp's efforts to extinguish the fire failed so he radioed for a pumper which, on arrival, put the fire out. There was an uncapped gasoline can in the passenger compartment immediately behind the driver's seat. This can defendant had bought some days before. Dr. Miller, the body in the car, was dead, having, according to the medical evidence, died in a matter of seconds as a result of the fire.

Lance drove defendant home but returned with her to the scene about 3 a.m. There defendant told substantially, though not in as much detail, the same story which later she told Sergeant Robinson at the police station and related on the stand.

The Volkswagen was on the outside of the roadway on the dirt shoulder, a portion of the car being on the pavement. Officer Robinson saw a tire mark made by an inflated tire (not a flat) leading up in an easterly direction to the dirt shoulder portion of the roadway. The dirt shoulder is next to a retaining wall which is four feet high down to a lemon grove. The road was a lonely, dark one, apparently not much used, although defendant testified that she had used it occasionally going to her home. The gasoline can showed no indication of distortion or bulging. It was empty. The threads had a burned residue but were not stripped; the neck was still on it.

The car's tires were deflated except the left front one. They were burned through in different degrees. The right rear wheel was below the surface of the ground in a hole. There was a large rock in the middle of the rear seat. The headlight switch was in the parking light position. The hand brake was off and the gear shift was in low gear.

An autopsy on Dr. Miller's body disclosed large amounts of barbiturates taken two to four hours before death in the bloodstream. These drugs were readily accessible to defendant and her husband, a dentist. The morning of his death, defendant procured some nembutal capsules for him to take. A witness saw defendant driving the car shortly before the fire; a form, which defendant said at the trial was her husband, was slumped over in the front seat and covered with a blanket.

Experts testified that the Volkswagen could not have burned the way it did without an accelerant. As will hereinafter appear, a similar auto was burned under experimental conditions approximating the People's theory of the case, pouring gasoline (accelerant) inside the car, leaving the open can tilted on the back floor, igniting the gasoline while standing outside the car by means of a stick used as a torch (a charred stick was found near the car), opening the door on the driver's side for draft, etc. The results were similar to those of the Miller car and the gasoline cans were similarly scorched. Other experiments (also hereinafter discussed) indicated that the fire could not have been accidentally caused and refuted defendant's theory that a blown-out tire caused the stopping of the car on the road.

Dr. Miller had considerable life insurance, including double indemnity, payable to his wife, of which defendant had knowledge. Although his practice of dentistry was fairly successful, netting approximately $25,000 yearly before taxes, the Millers had debts of $64,000, of which $30,000 was attributable to the recent construction of their new home, the building of which the doctor did not favor, although he went along with it to keep peace in the family.

Defendant and Arthwell Hayton, an attorney, whose families were close, were even closer; on three different occasions they stayed together in motels. Defendant wanted very much to marry Hayton. The record shows that defendant's involvement was very deep, she having asked Hayton to divorce his wife and having advised Mrs. Hayton to divorce him, but he was content with simple adultery. Finally he became tired of her and did his best to break off the relationship, particularly

when she began publicizing their affair and threatened to "expose" him if he would not marry her. In spite of his attitude toward her, the evidence clearly indicates that she was still attempting to contact him and raises the reasonable inference that if she were free to marry she believed Hayton would marry her.

Defendant denied all guilt. She explained her obtaining the barbiturate pills as necessary for her husband's illness. She recounted the details of the night in question. About 7:30 p.m., the doctor drove defendant in the Volkswagen, intending to go to a dry cleaners in Pomona. En route, their car killed a large German shepherd dog and damaged the left front light of the car. The accident upset the doctor because this was the third car of his that had been damaged in four months. Nevertheless, he drove to a hobby shop where defendant purchased glue for her boy's model toys. Then they went to the cleaners. He complained of a headache and asked defendant to drive on the return home. At home, the doctor reclined on a couch and watched television with a pillow under his head and a blanket over him. Defendant joined him under the blanket. When the movie was over, the doctor asked defendant to fix him some hot chocolate. She discovered that there was only about 1/8 gallon of milk left in the refrigerator. She told the doctor that this would not be enough for breakfast if she used any of it for hot chocolate. He suggested that they drive to Woody's Market and get some. The doctor took the pillow and blanket to the Volkswagen, which the doctor had rented. They did not take her car. The doctor climbed into the right front passenger seat, wrapped the blanket around himself and leaned his head on the pillow against the window. Defendant drove and, noticing that her husband was leaning against the door, reached over and locked it. Woody's Market was closed. They then decided to go to the Mayfair. A witness saw them as they approached it. This was about 12:30 a.m. The witness noticed defendant sitting in the driver's seat and what appeared to be a large bundle covered by a blanket with a lump, which could have been a human being, and if it were, the person's head was probably against the window. There was evidence that defendant parked at the Mayfair in a place where the parking lot's lights would not show Dr. Miller's side of the car, nor be likely to awaken him. Defendant went into the market and brought out two half-gallon cartons of milk, placing them on the floor of the rear passenger compartment of the Volkswagen. She did not notice the gasoline can. The evidence

showed that the route she took home was circuitous and long and a rather peculiar one for a woman with a sick husband, as the doctor was that night, to take home at such a late hour. One light of the Volkswagen had been damaged in the dog accident and the condition of the light switch after the accident indicated that defendant drove with only her parking lights on. The last part of the journey was on an unlighted street and defendant was wearing dark tinted glasses.

She was driving at 30 to 40 miles per hour when she felt the steering wheel pull, as in a blow-out. She immediately pulled in the opposite direction. The car went out of control and landed on the shoulder without the application of brakes. She remembers in a sort of subconscious way, wheels spinning, then a large flame behind her. She panicked and the next thing she knew she was standing outside the open door of the car which was in flames. There were too many flames and it was too hot to try to pull the doctor out the door. She ran around the car and tried to open the door on the passenger side. Then she remembered she had locked it. Her next thought was to get a rock and throw it through the window. She found one but could not dig it out of the sand. She found another and threw it through the front window (a nine-pound rock was found on the back seat after the fire). The heat was so intense she could not get the door open. She went down the bank looking for a stick with which to push her husband out of the car but could not find one large enough. She found one too small but nevertheless she hurried with it back to the car. She doesn't know what she did with the stick, possibly she dropped it. She ran in the direction of a car passing a nearby corner. It kept going. She then remembered the home of Mrs. Bridges at that corner. The house was unlit and she couldn't find it. She turned and went running in another direction. As she passed the burning Volkswagen, she stopped and saw her husband. He was black. She then saw the gasoline can. She ran to Mrs. Swenson's house some distance away.

There were many circumstances shown by the evidence contradicting defendant's story of the action of the auto before the fire started and supporting the prosecution's theory of a deliberately-set fire. Among others was evidence that the fire could only have been started by an accelerant; the facts that Dr. Miller was sound asleep from an overdose of nembutal which he wasn't in the habit of taking, and which could only have been given him by defendant, as defendant stated that he did not get the nembutal, that she had purchased it; that

defendant drove on a dark, lonely, deserted road; that defendant had given Dr. Miller pills all week which were making him dizzy; the peculiar circumstance that a man recovering from the flu would ride many miles late at night bundled up in a blanket to get milk; that defendant chose the leased car with which she admitted she was not too familiar instead of her larger, more comfortable one; and the fact that the damage to the Volkswagen was not consistent with an accidental fire.

The evidence supported the prosecution's theory that defendant had planned for the car to go over the wall, land on the gas tank and be set afire; that she attempted to drive the vehicle over the edge but was thwarted. As the rear wheels spun, the car settled on a rock. A reasonable inference can be drawn that defendant had stopped the car on the pavement, spread the gasoline, put the car in low gear and started it toward the edge, that it was stopped by the shoulder and that after repeated attempts to run the car over the edge, defendant lit the fire. The only parts of defendant's body that were singed by fire were a slight singe of the hair on the back of her head and on her right forearm. This was consistent with the singeing having occurred as she reached towards the gasoline flowing from the tilted can with a burning stick and turned her face away as she lit the fire. As the car was too close to the retaining wall, defendant could not have run around the car to the doctor's side, as she testified, without falling over the wall.

A reasonable inference is that defendant wanted Dr. Miller's body to be consumed to avoid the discovery at an autopsy of the barbiturates. When arrested she had asked the officers if there was enough left of the doctor for an autopsy. Defendant made no reasonable effort to save the doctor after the fire. Defendant was wearing Dr. Miller's watch and no trace was found of his wallet which contained considerable money and from which she took the money to pay for the milk.

The accidental fire theories presented by the defense were contradicted by the prosecution's experts as being highly improbable in view of the condition of the Volkswagen.

There was evidence that defendant was a selfish and avaricious woman who had long before lost all love and interest in her husband and the life he was providing for her. She wanted another man's love, money, social status, prestige, and association with wealthier people.

More of the evidence will hereinafter appear in the discussion of the contentions made by defendant.

## 2. ALLEGED MISCONDUCT OF THE DISTRICT ATTORNEY
### a. Opening statement.

█ Defendant contends that in his opening statement the district attorney made assertions of fact that he did not intend to prove and did not prove. As said in *People* v. *Ramsey,* 172 Cal.App.2d 266, 272 [342 P.2d 287], quoting from *People* v. *Chester,* 142 Cal.App.2d 567, 574 [298 P.2d 695] : " 'it is the duty of counsel to refrain from referring to facts which he cannot or will not be permitted to prove.' . . . But the failure to produce proffered proof, 'either on account of the rules of evidence or for any other reason, does not necessarily indicate prejudice.' (*People* v. *Flanagan* (1944) 65 Cal.App.2d 371, 407 [150 P.2d 927].)'' █ Unless the record indicates that the statement not later supported by the evidence was made in bad faith or without intention of trying to support it by the evidence, it cannot be said that the district attorney was guilty of misconduct because he failed to produce such evidence. (*People* v. *Wong Hing,* 176 Cal. 699 [169 P. 357].)

█ With these rules in mind, we examine the statements of which complaint is made. These are : that defendant felt Dr. Miller was not socially-minded enough; didn't feel he tried hard enough to make money; that defendant liked a higher level of society than the average, liked to associate with well-to-do people, to visit with them in their lovely homes and wanted to mingle with them on an equal basis; that defendant decided that their little home in Ontario wasn't on a par with the homes of some of their friends and she wanted a finer home in a nicer neighborhood; █ that Dr. Miller was not interested in having a more expensive home and that without his help and entirely on her own defendant decided to have a fancier home and purchased a lot in Alta Loma; that defendant, through one of her attorney friends, arranged for a construction loan to build a house thereon; █ that some time last year she obtained a new car, a Mustang, and that it had most of the extras obtainable for a Mustang; that the indebtedness for the Mustang was around $3,500, in spite of other debts; █ that Dr. Miller was in the hospital when he was served with divorce papers; █ that Dr. Miller was very unhappy about the divorce and was staying with friends, but that defendant was concerned to keep him working and the income coming in; that she had him to dinner every night, feeding him a special diet because of the doctor's ulcers; that it became more and more clear that they were going to lose their home and everything else if defendant

didn't have Dr. Miller's income regularly; that defendant gave some consideration to the possibility of her losing the children because of the divorce and that she pretended to reconcile with her husband primarily for the economic reasons involved.

A prosecuting attorney may state reasonable inferences from the facts he intends to prove and to draw reasonable conclusions. See *People* v. *Lucas,* 160 Cal.App.2d 305, 308 [324 P.2d 933], and *People* v. *Stone,* 199 Cal. 610, 621, 622 [250 P. 659].

 Defendant herself said that for 14 out of the 15 years of her marriage she felt herself rejected; that Dr. Miller was not affectionate towards her; that off and on over the years she wanted herself ''unmarried'' and that there were times the preceding summer when she wanted to get rid of her husband and marry Hayton. Hayton testified that she liked the society and people he associated with and admired him because he was a successful lawyer. Sprengel, a prosecution witness, testified that defendant told him that she had lost her affection for her husband and didn't really care what the doctor thought about it; that he had more or less cut himself off from her and if he tried to do anything about it ''he'd get his''; that defendant loved Hayton and would like to marry him and had suggested to Mrs. Hayton that she divorce Hayton; that after the reconciliation between defendant and Dr. Miller, defendant told Sprengel that the reason they had resumed living together was that if she couldn't have Hayton, a man with $25,000 a year income was better than nothing. These facts, plus the fact that the Millers were in a very bad financial strait, support the statements of the district attorney as to what the evidence would show on these subjects.

 Hayton testified that Dr. Miller was opposed to building the new home and said that defendant had said all her other friends were having new homes and she was going to have one. Nourse, the accountant, testified that Dr. Miller was very much against building the new house and was quite disturbed over the fact that defendant had signed his name to a note for $5,000, the money to be used in building the house, but wanted to maintain peace in the family. The accountant who handled the business affairs of the Millers was not consulted about the new house and the funds were borrowed without consultation, defendant having obtained all the financing for the building. The contractor testified that he built the

house for defendant; that the only time he talked about it with Dr. Miller was when the latter signed the contract; that he did not discuss any of the financial problems with him; and that defendant had instructed him not to talk to Dr. Miller about the finances.

Defendant introduced evidence to the effect that Dr. Miller did desire a more expensive home and did participate in the commencement of the project. The contradiction caused by this testimony was for the jury to decide and in no wise proved that the district attorney's statements were not supported.

During the separation of the Millers and while they were having financial troubles, Dr. Miller purchased a $3,500 Mustang with air conditioning and gave it to defendant to be her car. A reasonable inference under the circumstances of the case is that defendant wanted the car. In any event, if the district attorney's statement was stronger than the actual fact, his failure to prove the statement completely was not prejudicial.

Dr. Miller was in the hospital in May. The divorce was filed on July 8. Apparently there was no evidence as to whether the divorce complaint was ever served on Dr. Miller. The district attorney had the right to assume that when the divorce action was filed the complaint would be served. He stated that he wasn't sure Dr. Miller was in the hospital when served.[2] At least, the divorce troubles of the parties were occurring while Dr. Miller was in the hospital and for some time thereafter. The district attorney's statement under the circumstances did not indicate any bad faith on his part.

The evidence showed that Dr. Miller was unhappy about the situation between himself and defendant; and in view of the fact that with the divorce action pending and Dr. Miller living away from home, defendant was providing his diet for dinner, defendant's statement in effect that she returned to him for economic reasons lends some color to the inference that defendant wanted to keep him working and the income coming in and that it became clear they would lose the house if the doctor did not continue to have regular income. In any event, there was no prejudice.

Although there was no testimony that defendant feared losing her children because of the divorce action, there

[2]The district attorney modified this latter statement by saying that he was not sure but it was right around this time. At any rate, Dr. Miller was recovering from an ulcer.

was always that possibility because of the admitted adulterous affair between defendant and Hayton in 1963 and 1964.

Comparing the opening statement with the evidence adduced and the reasonable inferences to be drawn therefrom, we find no evidence of bad faith upon the part of the district attorney, nor any prejudicial conduct.

### b. Cross-examination of defendant.

■■■ Defendant contends that the district attorney was guilty of misconduct in asking her on cross-examination whether she had stated to anyone that she wished her husband dead. She answered in the negative. No objection or assignment of error was made. The district attorney produced no evidence of such statement having been made. At the hearing of the motion for new trial, the district attorney stated that he had been advised that Yolande Ford would testify that such statement was made to her. Yolande testified, but not to this matter. The district attorney said he thought he had asked the court to order her to return. He found that he had not and then got a subpoena for her appearance, but she could not be located. We cannot say, considering the evidence as a whole, that the district attorney was guilty of misconduct, nor that the asking of the questions was prejudicial.

■■■ Defendant had said that this accident seemed ''sort of like a movie'' she had seen. The district attorney asked her if it was the movie she went to the Saturday before the accident, which movie opens with an auto going off the road and down a cliff, killing the driver. Defendant objected on the ground the question was ridiculous. The objection was overruled. Defendant answered apparently that this was not the movie to which she referred. There was no misconduct in asking the question, as defendant herself had opened the subject of similarity of this accident to that in a movie.

The district attorney asked defense witness Joan Lance whether defendant had told her that she considered herself quite an actress. The witness said, ''No.'' He also asked defendant if she had ever been an actress. She replied in the negative. No objection was made to these questions. However, when she was asked if she had told the Reverend Teel that she had been an actress, defendant objected and the objection was sustained.

■■■ The district attorney asked defendant, ''Last spring and summer when you wanted to marry Mr. Hayton, then, I take it that you wanted to get rid of your husband, is that

right?" Objection was made to the words "get rid of your husband." After some discussion, the district attorney said he would phrase it another way and asked if during that period "did you want to be unmarried to Dr. Miller?" to which defendant replied, "Toward the end, yes." Defendant contends that the use of the words "get rid of" constituted misconduct. As the district attorney showed what he meant by those words in phrasing the question another way, there could not possibly be misconduct.

In cross-examination, the district attorney asked defendant if a couple years before her affair with Hayton she had not wanted to marry one Pappajohn. She replied, "No." Defendant then claimed that this question violated an agreement made in chambers that they would not go into any "old romances." The court then sustained the objection and ordered the answer stricken.

The district attorney then asked if defendant periodically had gone to marriage counselors in connection with her marriage problems. She replied that she had gone to a psychologist and to a doctor friend. No objection was made. The district attorney then asked if the visit to the psychologist was in 1960. Then defendant objected and the court sustained the objection on the ground the incident was too remote. There was no misconduct here. The testimony would have been relevant as bearing upon the marital relations of the Millers.

Defendant's direct examination was limited to the events of the day before, and the day of, Dr. Miller's death. She was not asked concerning her feeling toward her husband or toward Hayton. Prior to cross-examination, defendant sought to limit her cross-examination to that period. A ruling was made limiting the cross-examination, but not to the extent requested by defendant. On cross-examination, defendant was questioned, over objection, as to her relations with Hayton, about her finances, the borrowing of money, the signing of documents, and other matters herein discussed. Defendant contends this questioning was beyond the scope of her direct examination and therefore compelled her to be a witness against herself.

In her direct examination, defendant expressly denied having set fire to the Volkswagen and having murdered her husband. Additionally, her testimony concerning the day of the homicide was carefully designed to convey the impression that she was a dutiful and loving wife, taking care of her husband and lying on the couch with him that evening under a

blanket, and that the relations between them were excellent. This opened the door for cross-examination as to the relations between them prior to the fire. The case was dependent upon circumstantial evidence for proof of a homicide, so it was important to show motive and intent. Thus, evidence which would discredit, qualify, and destroy defendant's denials of guilt and claims of good relations with her husband was admissible. This included evidence of her infatuation for and illicit relations with Hayton, the entire financial situation of herself and husband, indications of strife between them, her real relations with her husband, and the other matters brought out. ██ As said in *People* v. *Pike*, 58 Cal.2d 70 [22 Cal. Rptr. 664, 372 P.2d 656] : "If a defendant takes the stand and makes a general denial of the crime with which he is charged, the permissible scope is very wide. [citations]" ██ Moreover, as stated in *People* v. *Teshara*, 141 Cal. 633, 638 [75 P. 338] :

"A defendant cannot, by testifying to a state of things contrary t ᵢ and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies. He can be cross-examined with respect to facts or denials which are necessarily implied from the testimony in chief, as well as with respect to facts which he expressly states."

██ Defendant was asked on cross-examination if she had not, within 30 days before Dr. Miller's death, talked to a man named James, asking him questions concerning what could be learned by an autopsy. Defendant objected that this question went beyond the scope of the direct examination. The court properly overruled the objection as the matter was relevant, indicating defendant's interest in what could be learned by an autopsy, and at the time of her arrest defendant asked if there was enough of Dr. Miller's body left for an autopsy. (Dr. Miller's autopsy showed an excessive amount of barbiturates.) Defendant first said that she had no recollection of the conversation or the name of the man. The district attorney identified the man as one studying to be a school teacher, and defendant said that it was possible that there was some such conversation and that "This could have come up." When asked if she remembered inquiring of anybody concerning what could be learned in an autopsy she replied in the negative.

### c. Examination of witness James.

James testified to having had a conversation with defendant concerning autopsies. The district attorney then asked what defendant had said. He replied, ''If a coroner's investigation produced a given statement, is it possible that that statement when entered on the autopsy report could have been changed?'' Defendant contends that James' testimony was in impeachment of defendant and hence the impeaching questions should have been framed in the exact language used in the questions put to defendant, and also that the impeachment was on an immaterial matter. As to the latter objection, as we have stated, defendant's interest in an autopsy was material and relevant. James' testimony was not offered as impeachment but as rebuttal to defendant's testimony that she did not have such a conversation and to show her interest in autopsies. The district attorney explained that he did not call James in his case in chief because he did not know of James at that time. There was no error in the cross-examination of defendant or the examination of James.

### d. Cross-examination of Priscilla Slagle.

She testified to suicidal threats made by Dr. Miller. She was later asked as to when the first time was that Dr. Miller had talked about killing himself. She replied that it was in 1959. The district attorney then asked if it was in connection with an affair defendant was having at that time. She replied that it was not. Thereupon defendant objected and the objection was sustained. She was then asked if defendant had an affair with someone other than Hayton after Miss Slagle moved into the Miller home (this was in 1959). She replied, ''No.'' Defendant then objected and the court sustained the objection and the jury was admonished. The district attorney, in chambers, contended that these questions were competent to disclose the motive for Dr. Miller's admitted depression, talk of suicide, and taking of barbiturates. The court ruled that while the questions might have been pertinent on rebuttal if defendant claimed she and the doctor were getting along all right, it was not proper cross-examination of Priscilla. Defendant contends that the questions went to a period beyond the period to which the court in chambers had previously limited proof of ''romances.'' Where, as here, there was considerable evidence of lack of affection of defendant for her husband, it was competent for the prosecutor to prove that over a period of years the relationship between the spouses gradually deteriorated. Whether the court properly limited

this period to the Hayton affair we are not called upon to decide. In any event, the actions of the district attorney were not prejudicial, particularly in view of the fact that the court in the original hearing, in chambers, had not made any definite limitation, merely stating that the district attorney should not go into "old romances."

### e. Impeachment of Dr. Ford.

Defendant contends that the trial court erred in allowing the impeachment of this prosecution witness by evidence of contradictory statements, contending that there was no showing of "surprise" because the district attorney had not talked to the witness before the trial and was relying solely on the basis of reports made by officers of statements made to them by the witness. It is not necessary for counsel to have personally talked to a witness in order to claim surprise when the witness testifies contrary to what the counsel had reason to believe he would testify. Thus in *People* v. *Kidd*, 56 Cal.2d 759 [16 Cal.Rptr. 793, 366 P.2d 49], it was held that it was not unreasonable for counsel to assume that the witness's testimony would be the same as a statement attributed to him by the press some six years before and that such statement justified counsel in claiming surprise when the witness testified contrary to such statement.

In *People* v. *Howard*, 226 Cal.App.2d 281 [37 Cal.Rptr. 918], the surprise upheld by the court as ground for impeachment of a prosecution witness was, as in the case at bench, a statement made to the police by the witness. The court said, at pages 287-288: " '[I]t has been held that the trial courts should be liberal in permitting such impeachment, and doubts should be resolved in favor of allowing the testimony.' (*People* v. *Spinosa* (1953) 115 Cal.App.2d 659, 668 [252 P.2d 409].)' "

In *People* v. *Pickens*, 190 Cal.App.2d 138 [11 Cal.Rptr. 795], the failure of the witness to testify similarly to a statement to the police was held to constitute surprise.

As said in *People* v. *Howard, supra,* 226 Cal.App.2d 281, 288: " 'To permit impeachment of one's own witness in this state, three elements must exist: (1) damage to the party calling the witness; (2) materiality of the evidence; and (3) surprise at his present testimony.' " Defendant does not contend in her brief that the first two elements did not exist in Dr. Ford's testimony. They clearly existed, as did the district attorney's surprise reasonably based upon the police reports.

### f. Evidence of bad checks.

Defendant contends that the court erred in permitting Sprengel, the contractor who built the new home for defendant, to testify over objection that in the course of building the house defendant gave him two checks to deposit in the building trust account which were returned for insufficient funds and which defendant later made good. There was no error in the admission of this evidence. It tended to show the financial straits of the Millers and the fact that the financing was done by defendant, rather than by both Dr. Miller and his wife.

### g. Examination of Dr. Modglin.

Dr. Modglin, the pathologist who examined Dr. Miller's blood after the autopsy, testified that it did not contain enough barbiturates to produce death, but that it did contain enough to produce sleep and was more than a normal therapeutic dose. He was then asked two hypothetical questions: one, whether a person, having taken two barbiturates as sleeping pills and a suggestion is later made to him to take two more, would take the latter without realizing he had already taken some. The second question was, assuming a man takes one or two barbiturates to insure a good night's sleep and his wife prepares a cup of hot chocolate in which she puts a fairly large amount of barbiturates, would it be likely that the man would detect a difference of taste in the chocolate.

Objections were sustained to both questions. Dr. Ford had testified to the effect that barbiturates have a mind-dulling action and that it is "well recognized in the use of barbiturates that individuals can forget that they have taken some and turn around and take more." There was no citation of misconduct nor request for an admonishment as to the two hypothetical questions. It is doubtful if the first question should not have been permitted to be answered. In any event, there was no misconduct.

### h. Examination of witness Nourse.

A question was asked by the district attorney of Mr. Nourse, the accountant, as to whether he was contacted by defendant's attorneys the day Dr. Miller died and if they asked him to hand over all his books and records. He replied in the affirmative and an objection was sustained and the answer stricken. Although this question should not have been asked, no assignment nor request for an admonition was made and it does not appear that the asking of the question was prejudicial.

*i. Argument.*

 Defendant refers to certain statements of the district attorney in argument, characterizing defendant and her actions. They need not be repeated here, as all of them are supported by the evidence and the reasonable inferences that would be drawn therefrom. The district attorney's right ''to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions fairly to be drawn therefrom.'' (*People* v. *Eggers,* 30 Cal.2d 676, 693 [185 P.2d 1].)

Moreover, defendant did not object to any of the statements. As said in *People* v. *Wein,* 50 Cal.2d 383, 396 [326 P.2d 457], where the court held that it had consistently rejected claims of misconduct where objections concerning arguments of the district attorney were raised for the first time on appeal, saying: ''. . . this is not a case where any possible harmful effect . . . could not have been obviated by a timely admonition to the jury . . .''

*j. Defendant's attorney's instructions*
*to defendant not to talk.*

 At the trial, a taped recording of the conversation between Sergeant Paterson and defendant at the police station was admitted without objection by defendant.[3] In this recording was a statement by defendant that her attorney, Lance, was cooperative with the highway patrol at the scene of the accident. She said, ''He had me talk to them. I told them everything they wanted to know . . .'' When they returned to her home, where the coroner and other officers were present, the attorney told her not to talk any more.

In his opening statement, the district attorney said that the coroner, deputy sheriff, and highway patrol officer went to defendant's house early in the morning to talk to her, and that they were met at the door by two attorneys who advised them that defendant was under sedation and could not talk to anyone; that they would not permit the officers to talk to her.

This statement was indefensible. However, the defendant not only made no objection to the statement, but also did not

---

[3]When the recording was offered in evidence to be read to the jury, defense counsel's reaction was to state that he had listened to the tape before and as he recalled there was ''nothing in there that is irrelevant or immaterial but I'd like to check the transcript to see whether or not any part should be deleted.'' This he did.

object to the fact being admitted in evidence. The district attorney's statement, while inexcusable, was not the kind the effect of which could not have been overcome by a proper admonition of the court to the jury to disregard it, pointing out that it would be not only the right of the attorneys under the circumstances to advise defendant not to talk, but often their duty to do so.

### 3. SHOULD PROSPECTIVE JURORS OPPOSED TO CAPITAL PUNISHMENT HAVE BEEN EXCUSED?

The prosecution announced, at the beginning of the trial, that prospective jurors who had conscientious scruples against the death penalty would be excused; 59 out of the 119 prospective jurors evidenced such scruples. Defendant contends that the prosecution was not in good faith in making the announcement as the prosecution did not intend to ask for such penalty. On the questionable theory that jurors without such scruples are more apt to be convictors than those having such scruples, defendant claims error on the part of the court in excusing said jurors and that she was thereby deprived of a fair trial. Defendant concedes that the excusing of such jurors is proper under the present state of the law, but contends that we should now change the rule and apply it in this case.

Defendant makes the broad statement that the district attorney's alleged insincerity in stating that the death penalty would be sought appears in the *voir dire* examination of the prospective jurors, but points out no specific place where this appears. Our examination of the transcript in this respect fails to find any support for defendant's contention as to such insincerity. The fact that after defendant's conviction the district attorney stipulated that the issue of penalty could be determined by the court rather than by the jury, and that presumably the district attorney knew that the punishment would be life imprisonment, does not indicate that the death penalty was originally not to be sought. At the time of the penalty hearing, the district attorney was in a position to review all the evidence in the case and to weigh the probabilities of the jury's inflicting the death penalty as against the expense and strain of a jury trial on the subject.

In *People* v. *King,* 240 Cal.App.2d 389 [49 Cal.Rptr. 562], the same contention was made as made here, namely that it was error for the trial court to exclude prospective jurors who indicated upon *voir dire* examination that they were unequivocally opposed to the death penalty. The court first

pointed out that section 1074, subdivision 8 of the Penal Code, provides in relevant part: "A challenge for implied bias may be taken . . .:

" . . . . . . . . . . . . . . .

"8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case *he must neither be permitted nor compelled to serve as a juror*" [Italics ours.] The court, in holding that the trial court had acted properly in excluding the prospective jurors upon ascertaining their conscientious objections to capital punishment, reviewed many cases in California holding exclusion of such witnesses proper. We see no reason why we should disregard section 1074 and attempt to overrule the cases upon this subject. Indeed, we have no power so to do.

It should be noted that at no time in the trial court did defendant object to the prospective jurors' being questioned along this line, nor to the court's excusing those who conscientiously were opposed to capital punishment.

### 4. ADMISSION OF EVIDENCE
#### a. *Search of the Volkswagen.*

The Volkswagen started to burn around 1:30 a.m. and continued to burn for some three hours. California Highway Patrol Officer Randolph and Detective Callahan arrived at the scene shortly thereafter and examined it as it stood on the road shortly after 8 a.m. Davidson of the sheriff's office removed the gas can from its position on the floor in front of the back seat. About 9 a.m. the car was taken to a garage about five miles away. There, a nine-pound rock, parts of a Polaroid camera and an instruction book were taken from it. Further examination of the car was made from time to time by the officers. Defendant was arrested without a warrant approximately four hours after the car was removed from the scene.

Expert testimony as to the condition of various parts of the automobile and exhibits consisting of a burned tire, a tire rim, a gasoline cap, a gasoline can nozzle, a gasoline can lid and a light switch, taken from it were introduced at the trial.

In order to quell the fire, the car had been thoroughly opened both in front and in back. The trunk, engine compartment and the passenger compartment were all open to the public and all the car's contents and condition were readily visible. Obviously, at the garage a more detailed study of its condition was made.

Defendant contends that evidence of what was found in the car and its condition was the product of unreasonable search and seizure, citing *People* v. *Burke,* 61 Cal.2d 575 [39 Cal. Rptr. 531, 394 P.2d 67], holding that the search without a warrant of the car of a defendant arrested for burglary, not at the place of arrest but after the car was towed to the police impound lot, was improper, and *People* v. *King,* 60 Cal.2d 308 [32 Cal.Rptr. 825, 384 P.2d 153], holding that a search without a warrant of an auto at a distance away from the place of arrest of a narcotic suspect could not be considered incidental to the arrest. The parties devote considerable portions of their briefs to the question of whether the examination of the auto at the police garage constituted a "search." Assuming that it did, under the circumstances of this case, such a search was not unreasonable. It was the duty of the police where a man had been burned to death in an automobile to find out if they could what had caused the fire. The articles taken from the car were obvious to anyone looking at the car, as was its general condition. However, a more detailed inspection of the car was necessary in the endeavor to determine the fire's cause and to determine whether the fire was accidental or otherwise. This could not very well be done on the public street. Nor could the car be left there to be mauled over by an inquisitive public, which, on learning that a man had lost his life in it, would have been all over the car. The situation is analogous to that where a person suspected of homicide is found in possession of a gun. It has never been held that a search warrant is necessary to enable the police to test that gun by firing bullets from it to determine if the gun was the one used in the killing.

Moreover, at the time the car was taken to the police garage, it was taken not as incidental to an arrest but for the commendable purpose of trying to find out how the fire had occurred. Had the examination of the car shown that the fire had been caused by some condition of the car, there never would have been an arrest.

Cases like *People* v. *King, supra,* 60 Cal.2d 308, dealing with searches of autos to discover contraband or weapons are not in point. Here, a detailed search of the car which could not be made on a public street was necessary to determine whether the instrument of death—the car—was a criminal or an accidental one.

In a sense, the situation here was somewhat similar to that in *People* v. *Smith,* 63 Cal.2d 779 [48 Cal.Rptr. 382, 409 P.2d 222], where the court held that the search, without a warrant.

of the defendant's car at the police garage after defendant had abandoned it in escaping from the police was proper even though not incidental to his arrest and its removal did not come within the incidental-to-arrest requirement. Although there was no abandonment of the Volkswagen by defendant, the *Smith* case is relevant on the subject of search made when not incidental to arrest.

### b. Testimony of the undercover agent planted in defendant's cell.

It is almost incredible that in these days of enlightened treatment by prosecution authorities of persons charged with crime, the Peggy Fisk incident could have occurred. Peggy was an undercover agent, working in narcotics and employed by the sheriff. She was falsely booked in the jail as a narcotics violator and placed in a cell with defendant for the purpose of conversing with defendant in the obvious hope that defendant would make some statement helpful to the prosecution. She remained in the cell for approximately a week. Peggy reported from time to time to the officers her conversations with defendant. Peggy testified at the trial to a portion of her conversation with defendant. She, of course, did not tell defendant that she was a law enforcement agent. She did tell defendant that the matters she and defendant discussed should be revealed to defendant's attorney.

Peggy's direct examination was limited to statements made by defendant to the effect that she had not loved her husband, but had respected him; that she had always loved Mr. Hayton and still loved him, and that after the "mess was over" she was going to take the insurance money, which was in excess of $100,000 because of the accidental death, and move to Europe with the children because she did not want them "crucified."

On cross-examination by defense counsel, it appeared that Peggy showed defendant a newspaper clipping concerning the case to indicate to defendant that the press was "ruining her." Under instructions, Peggy told defendant that she had overheard a conversation in the hall between four men whom she thought were from the district attorney's office, in which one of them said, "Getting back to the Miller case, Arthwell Hayton came in and blew the top off the case."

Peggy told defendant that she had talked to the sheriff and that they had discussed Peggy's getting "a floater out of the State." Peggy then said to defendant, "I put all my trust in

Mr. Bland [the sheriff] and maybe it would do some good for you if you tried the same. Peggy indicated that she had mistrusted her own attorney and indicated that perhaps defendant should mistrust hers.

On cross-examination defense counsel brought out in some detail statements by defendant to Peggy concerning the events of the fire in which defendant maintained her innocence and told practically the same story she later told on the stand.

When Peggy was called to the witness chair, defense counsel objected ''to any testimony from the witness at this particular time'' on the ground that he had not been given her address as promised. Thereupon proceedings were adjourned to chambers. Discussion ensued between court and counsel in which the district attorney stated that the witness had not been available until that day, and an opportunity was not given defense counsel to interview her. Defense counsel stated, ''I am going to represent to the Court also that any testimony of this witness concerning any statement made by my client would be in violation of the rule in the *Dorado* case. She was an undercover agent, and never informed my client of her capacity. Never advised my client of my client's right to remain silent.'' Considerable discussion followed and then the court said, ''Well, I think in view of the circumstances related that Mr. Foley [defense counsel] was promised an opportunity to talk to this witness, I think you should withdraw her.'' The district attorney agreed to do so. Thereupon the following occurred: ''THE COURT: Now, on the *Dorado* objection— ''MR. TURNER: [deputy district attorney] You would have to wait and listen to the *voir dire* on the stand and see.''

Immediately defense counsel began talking about a case in which it was held that it was error to permit at trial evidence that the defendant had refused to testify before the grand jury relying on the Fifth Amendment. The discussion ended as follows after the district attorney agreed to withdraw the witness until the next morning:

''THE COURT: In the meantime, you will have the opportunity to talk to her but on the other objection, we would have to have her sworn and at least testify to the preliminary questions anyway, and have an objection made at the proper time.

''MR. FOLEY: You know that isn't right, your Honor.

''THE COURT: Unless you want me to look at this report and see what she knows. Does this report indicate?

"Mr. Turner: There has to be a foundation laid, an objection made. There is no way to—

"The Court: I think there would have to be. I don't see how that could be done in the absence of the Jury."

The following day Peggy was called to the stand. The district attorney questioned her concerning her assignment to pretend being a prisoner and concerning her becoming a cellmate of defendant. He then asked her if defendant had talked to her about her husband and domestic problems. When he asked what defendant had said in this respect, defense counsel asked permission to ask questions on *voir dire*. He then brought out that Peggy had not informed defendant of her agency, nor that defendant had a right to have an attorney present when Peggy talked to her. When he asked Peggy if she told defendant of her right to remain silent, Peggy replied, "I told her that she should discuss this with her attorney." Thereupon the direct examination was resumed. At no time during Peggy's testimony was any objection raised, either to her testifying at all or to any question asked of her. While in the in-chamber discussions, defense counsel indicated that he was going to object to her testifying; he did not then nor thereafter ask the court for a ruling. A reading of the entire record of the trial indicates that defense counsel gave defendant an able and skillful defense. In view of that fact, the fact that counsel in the in-chamber discussion had in mind the *Dorado* and *Massiah* decisions; the small portion of the talks with defendant which the prosecution brought out on direct examination which did little if any harm to defendant; the fact that the extensive cross-examination of Peggy brought out that defendant stoutly maintained her innocence and told identically the same story, to which she later testified; and the fact that defense counsel had received a copy of Peggy's reports to her superiors concerning her talks with defendant, it is reasonable to assume that defense counsel was willing to have Peggy testify to show (1) the extremes to which the sheriff went to try to convict defendant and (2) that defendant's story of her innocence had never varied.[4]

The trick attempted by the authorities in which they apparently hoped to obtain incriminating statements from defendant and to get her to throw herself on the alleged mercy of the

---

[4]See *People* v. *Valdez*, 239 Cal.App.2d 459, 466 [48 Cal.Rptr. 840], where the court refused to permit, on appeal, the raising of an *Escobedo-Dorado* question not raised below and which the court presumed the trial counsel felt was to his benefit not to raise.

sheriff and to suspect her own attorney was completely indefensible, and if we had the slightest idea that defendant was injured by it we would have no hesitancy in ordering a reversal in spite of the fact of defendant's failure to object to Peggy's testimony. However, to do so just to administer to the sheriff and those joining in this most inexcusable procedure a well-merited rebuke where no injury occurred to defendant therefrom would not be fair to the County of San Bernardino nor to defendant in requiring her to undergo the strain of another trial.

We have in mind *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]; *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; and *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], but do not consider, under the peculiar circumstances in this case, there was any prejudicial error. Moreover, as pointed out in *People* v. *Palmer,* 236 Cal.App.2d 645, 650 [46 Cal.Rptr. 449], referring to *Escobedo,* failing to object in the trial court precludes raising the matter on appeal, the court saying: "But the Supreme Court indicates, at least inferentially, in the same authorities that the raising of the issue on appeal, after the enunciation of the rule in the *Escobedo* case, must be based upon an objection taken in the court below." See also *People* v. *Valdez,* 239 Cal.App.2d 459, 465 [48 Cal.Rptr. 840], applying the same rule as to an *Escobedo-Dorado* situation.

### c. The Hayton affair.

It was the prosecution's theory that one of defendant's motives in killing her husband was to leave her free to marry Hayton. Defendant on two occasions moved the court, in the absence of the jury, to deny admission of any evidence concerning the relationship between Hayton and defendant on the ground that the prosecution's evidence did not come up to its offer of proof in chambers and because there was evidence that the affair had terminated. ▉ With the exception of one statement made in the offer of proof, the evidence did come up to the offer of proof and the failure to prove that statement did not affect the showing that defendant's relationship with Hayton supplied both intent and motive for Dr. Miller's murder. "No rule is more firmly established than that, upon the trial for murder of husband or wife, evidence tending to show illicit relations of the accused with another is admissible to show lack of love and affection for the defendant's lawful spouse." (*People* v. *Smith,* 55 Cal.App. 324, 335 [203 P. 816].) In that case, there was evidence of a reconcili-

ation between the defendant and his wife effected some time prior to the wife's death, but that fact did not prevent proof of the adulterous acts of the husband prior to the reconciliation.

In *People* v. *Brown,* 131 Cal.App.2d 643 [281 P.2d 319], the defendant attempted to kill his wife. The court said, at page 661: "His relation with other women was relevant to his bad relation to his wife which deserves consideration in the matter of motive."

*People* v. *Soeder,* 150 Cal. 12 [87 P. 1016], was a prosecution for the murder of the defendant's brother-in-law to obtain insurance money which the defendant thought would enable him to succeed in winning a certain young woman. This situation was disclosed by letters the defendant had written her. In a final letter, he declared the engagement broken and demanded a return of his presents. The court held that although the evidence of the other letters was impaired by the last letter, their effect was not destroyed thereby; that it could not be held that the letter showed as a matter of law that the defendant had given up all hope that with the money in his possession he could win the woman. Thus, in the instant case, defendant's claim that she was no longer interested in Hayton is by no means conclusive.

In July 1964, Hayton took a young woman to a square dance and then to his boat at Newport Beach. Defendant and Priscilla Slagle followed them and while Hayton and the woman were on board untied the boat so that it would bob up and down. When Hayton and friend left the boat, defendant and Priscilla followed. Hayton recognized defendant in the Volkswagen and succeeded in losing her in a sudden exit from the freeway. After delivering his companion to her home and returning to his house, he found the Volkswagen parked there. An acrimonious conversation with defendant followed, the substance of which was that Hayton didn't want to have anything more to do with her and she objected to his having avoided her. Defendant testified that from then on she no longer was interested in Hayton and contends that, therefore, there could be no claim that she killed her husband so that she might marry Hayton. However, the evidence discloses that she still was interested in him and a reasonable inference may be drawn therefrom that although he continued to keep aloof from her, she felt that she could win him if she were not encumbered by a husband. The next day after the boat incident, she telephoned Hayton at his home and apologized for

her conduct of the previous evening. Among other things, she stated that she wanted to be nice to him and for him to be nice to her and asked him to come over to her home that evening. After telling her that he did not want to see her, Hayton hung up. She called him again twice that night, endeavoring to get him to come to see her or let her come to see him. She also had Priscilla telephone him, urging him to come over to see her.

Thereafter, defendant repeatedly tried to talk to Hayton on the telephone, but he had instructed his secretaries not to refer her calls to him. She went to his house on two occasions, using as an excuse that her daughter wanted to see his daughter.

On July 31, she telephoned Sprengel, who recorded the conversation apparently to give it to Hayton, urging him to get Hayton to talk to her, as she knew "if he'd talk to me, we could straighten it out," referring to his "hate" for her. She said that Hayton would "weaken" if he saw her and that "He feels like I am a threat to his stubbornness." Although she told Sprengel that Hayton's emotional entanglement with her was over after the boat incident and after she went back to her husband, her entire conversation with Sprengel indicates that she still wished such entanglement.

On September 22, defendant showed Mrs. Sprengel a letter and stated that if she had married Hayton she would have destroyed the letter, and that in spite of things that had recently taken place she still loved him; that this was not the sort of thing you could turn on and off. (It was in this same month that defendant told Mrs. Sprengel that Dr. Miller had threatened suicide, on one occasion saying that he would drive his car off a cliff.)

On October 8, Sergeant Paterson found in defendant's purse a business card of Hayton's and two Christmas place cards, one with the name Arthwell (Hayton's first name), the other with the name Lucille.

▮▮▮ Hayton told how, after their three intimate occasions at motels, he had been pursued by defendant, of her desire to divorce her husband and marry him, of her asking him to divorce his wife, and that he had told her he didn't want her to talk like that, that he loved his wife and would not divorce her.

During the cross-examination of Hayton by defendant, her counsel informed the court that he proposed to question Hayton about conversations he had with defendant concerning an affair in 1963 with a girl named Bonnie; that he had left his wife because of Bonnie, thinking he would divorce his wife

and marry Bonnie; that his wife had given him a certain number of days to get rid of Bonnie. The court sustained objections to this proposed testimony. Defendant contends that this was error, as she contends it would tend to disprove the fact that he ever said to defendant that he would not think of divorcing his wife in order to marry defendant. The testimony of Hayton in this respect was not offered to prove the contents of the statement, but merely to show defendant's responses thereto and the intimacy existing between Hayton and defendant. Whether in April 1963 Hayton might have been willing to divorce his wife was irrelevant. Moreover, it is clear that in 1964 defendant wanted to marry Hayton and that her own testimony showed that he, for whatever reason, was trying to get rid of her, without complete success. The court's ruling that the matter proposed to be elicited on cross-examination was irrelevant and immaterial was correct. It was the type of matter concerning which the court said, in *People* v. *Harlan*, 133 Cal. 16, 20 [65 P. 9] : ". . . cross-examination, tending to show the general immorality of the witness, or specific acts of immorality, should never be allowed in any case for the mere purpose of discrediting or impeaching the witness. [citations]" See *People* v. *Blalock*, 238 Cal.App. 2d 209, 224 [47 Cal.Rptr. 604].

 It is well settled that the extent to which a cross-examination may be carried rests largely in the discretion of the trial court. (*People* v. *Morlock*, 46 Cal.2d 141, 149 [292 P.2d 897].)

The court did not abuse its discretion in limiting in this respect the cross-examination of Hayton.

 Hayton testified that defendant, over the last five years, discussed with him her desire to divorce her husband and asked him to represent her in a divorce action. When the district attorney asked him if several years ago alimony had been discussed, defendant for the first time objected on the ground of its being a privileged communication. The objection was sustained. Thereupon the district attorney, without objection, brought out that Hayton didn't handle divorce actions and in any event would not represent her because of their very close relationship. She never retained him as her attorney and told Hayton that she was talking to him as a friend and not as an attorney.

The district attorney then examined Hayton as to his relations with defendant and the many conversations he had with her. At no time did defendant object or raise the question of

privilege. Although for a short period Hayton's law firm represented Dr. and Mrs. Miller in a personal injury suit, none of the conversations testified to by Hayton related to that action. Defendant now contends that although no objection was made to Hayton's testimony, the court should have excluded it on the ground of privileged communications and thereby protect defendant from the "incompetence of her own attorney." Under the circumstances here, the fact that the communications were not privileged, and there being no attorney and client relationship at the time, the court was not called upon to act.

### d. Insurance.

■ The prosecution contended that one of defendant's motives in killing her husband was that she could enjoy the proceeds of his life insurance policies. The evidence shows that defendant was the beneficiary of policies which, in the event of Dr. Miller's accidental death, would pay her approximately $100,000; that defendant knew of these policies. Nourse testified that in 1963 he discussed with the Millers the insurance program. Defendant told Sergeant Paterson that she knew of a $20,000 policy and a $50,000 policy, as well as a dental association policy of a few thousand dollars; that the $20,000 policy was definitely double indemnity, and that she thought the $50,000 policy was also. Defendant contends that the insurance evidence was improperly admitted because the only connection between defendant and the insurance was that she had knowledge of it. Obviously, her knowledge of the insurance and the double indemnity phase of it was clearly admissible on the question of motive. Its weight was a matter for the jury. Evidence of the financial condition of the Millers was relevant to show the marital strife that existed and a cause of animosity of defendant towards her husband; to prove that defendant was in the habit of spending a great deal of money and would therefore need the insurance proceeds and was interested in marrying Hayton who was financially better off than Dr. Miller.

### e. Experiments.

■ Defendant contends that the court abused its discretion in allowing evidence of three experiments on the ground that there was no similarity of conditions between the facts of this case and those of the experiments.

The first experiment was by Davidson, the criminologist, to determine whether a nail driven into a Volkswagen tire and thereafter traveled upon would cause a leak or a blowout.

After the fire, the left front tire was still inflated, and the other three were down and partially consumed by fire. The right front tire had a nail imbedded in it. Davidson testified that he saw no evidence of a blowout. The defense contended that defendant's loss of control of the Volkswagen, to which she testified, might have been caused by a blowout due to this nail. Davidson's experiment included driving the tire 63 miles with the nail in it at speeds up to 55 miles per hour, without losing any of the air in it. Defendant's contention of lack of similarity of conditions is based upon the fact that the burned Volkswagen tire evidently picked up the nail while moving, while the experimental tire received its nail while stationary. " '[T]he determination whether the conditions were sufficiently similar to make the experiments of any value in aiding the jury is a matter resting in the sound discretion of the judge.' [citations] 'The conditions surrounding a test or experiment of this nature need not be identical with those existing at the time of the occurrence in question provided there is substantial similarity.' " (*Beresford* v. *Pacific Gas & Elec. Co.*, 45 Cal.2d 738, 748 [290 P.2d 498, 54 A.L.R.2d 910].)

The sole dissimilarity pointed out by defendant between the two tires did not cause the court's ruling to be an abuse of discretion. It is interesting to note that defendant did not object to the admission of the experimental tire in evidence.

The second experiment was also conducted by Davidson and was to test the amount of pull necessary to remove a neoprene tubing from a gas line similar to a Volkswagen line, both dry, wet and soaked with gasoline. Defendant's only objection to testimony concerning the experiment was that the facts were not similar in that the witness was asked how much pull it took when the tube was dry. When told that the experiment dealt with the tube when dry, wet and very wet, defendant made no further objection. The witness produced the wet tube used in the experiment and defendant asked that it be shown to the jury and made no objection to its being offered in evidence. There was no abuse of discretion in allowing evidence of the experiment.

The third experiment testified to was an experimental burning of a Volkswagen similar to that in which Dr. Miller met his death, to prove that a fire started in the passenger compartment with a gasoline accelerant could transmit itself to the engine compartment, burn away the flex neoprene tube gasoline line and permit the gasoline to drain from the tank to

150

the ground and burn the engine compartment, as was claimed to have happened to the Miller Volkswagen.

Snare, who testified to the incendiary nature of the fire which consumed the Miller Volkswagen, also testified to the experiment. No objection was made to this testimony and defendant cross-examined him at some length concerning the experiment.

Sergeant Davidson testified for a short period concerning the experiment without objection and then defendant objected on the ground of lack of similarity of the conditions of the two fires. The main purpose of the experiment was to illustrate that a fire started inside the passenger compartment could spread to the under surfaces and engine compartment of the car. Such dissimilarities in conditions as there were were not of crucial significance in determining the ultimate question above stated. The court refused to permit a showing of the movie taken of the experiment on the ground that it would tend to confuse the jury. The record shows that the court considered carefully the contentions of defendant as to dissimilarity of conditions and was of the opinion that the dissimilarity was not such as to affect the validity of the experiment. There was no abuse of discretion in the allowance of evidence of the experiment.

When Davidson was testifying to the condition of the Miller Volkswagen the day after the fire, defendant asked whether the debris in it was wet or dry. The prosecution objected on the ground that the question called for speculation. If the ruling was wrong, no prejudice resulted, as Snare had testified that that morning there was some moisture in the debris.

### 5. INSTRUCTIONS

#### a. Manslaughter.

The court instructed and gave possible forms of verdict on murder in the first and second degrees. It gave no instructions or form of verdict on manslaughter. Defendant contends that the court erred in this respect. However, she points out no evidence which would have justified a verdict of manslaughter. It was the position of the prosecution that defendant deliberately set the fire which killed her husband. It was defendant's theory that the fire was caused through no fault or intention of hers. Defendant claims that her testimony that the auto ''suddenly swerved as she was driving it; that it came to a stop on the shoulder of the road; that she saw a flame spouting from the rear of the passenger compartment; that she got out of the car, tried to rescue her husband

but was unsuccessful in her efforts'' justified a manslaughter instruction, but fails to state how her acts as testified could possibly constitute manslaughter.

A party is entitled to an instruction on an included offense if there is any evidence, even though weak, to show such an offense. (*People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281].) Voluntary manslaughter is a willful act, characterized by an intent to kill, *engendered by sufficient provocation,* and by the absence of premeditation, deliberation (by presumption of law), and malice aforethought. Section 192, subdivision 1, of the Penal Code defines voluntary manslaughter as the unlawful killing of a human being, without malice, ''upon a sudden quarrel or heat of passion'' (*People* v. *Brubaker,* 53 Cal.2d 37, 44 [346 P.2d 8]). Nor could involuntary manslaughter possibly apply. Under the definition of this crime (see Pen. Code, § 192), there must have been an unlawful act committed or the commission in an unlawful manner of a lawful act which might produce death. It is not contended that any such acts occurred.

There were no circumstances in the case at bench which could possibly bring the killing here within the definition of manslaughter. It was either murder or defendant was not guilty of any crime. ''An instruction which finds no support in the record, even though a correct statement of an abstract proposition of law, is improper when it finds no support in the evidence, and it is ground for reversal if it is calculated to mislead the jury.'' (*People* v. *Moore,* 43 Cal.2d 517, 530 [275 P.2d 485].)

''. . . if it must be said as a matter of law that, accepting the defendant's version of what took place, the crime could not have been manslaughter, the defendant was not entitled to such an instruction [manslaughter].'' (*People* v. *Zilbauer,* 44 Cal.2d 43, 49 [279 P.2d 534].) Neither under defendant's version of the evidence nor that of the prosecution could manslaughter apply. It would have been error had the court instructed on manslaughter had defendant requested it.

### b. Bad checks.

The witness Sprengel testified that during the construction of the house which he was building for defendant, two checks executed by defendant to deposit in the building trust account were returned by the bank for insufficient funds. They were later made good by defendant. Defendant states, ''No instructions were requested or given to show the limited

purpose for which such evidence was admitted'' and that the court erred in not instructing concerning such limited purpose. When the evidence was offered, the district attorney, in answer to defendant's objection that it was immaterial and irrelevant, stated that it was to show the sketchy financial basis of the family.

After admission of the evidence, defendant moved to strike on the ground that the testimony tended to prove another crime. The district attorney stated that he was not trying to prove a crime, but merely trying to prove the financial condition of the Millers. The motion was denied. Neither then nor at any other time did defendant request a limiting instruction. There was no error in the failure to give such an instruction, first because none was requested, and second because it clearly appeared that defendant had no intent to defraud but the ''bouncing'' of the checks was due to the financial difficulties of defendant and her husband at the time.

The evidence was admissible on the issue of motive to show that because of financial pressures on the Millers, there was animosity of defendant toward her husband and a desire on her part to get rid of her husband. There was evidence that defendant was having difficulty in financing the construction of the house and that Dr. Miller, because of the financial problems involved, was reluctant to go ahead with the project.

As stated in *People* v. *Lopez,* 60 Cal.2d 223, 249 [32 Cal.Rptr. 424, 384 P.2d 16] : ''. . . evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged.''

It is well settled that when evidence is admissible for one purpose, but inadmissible for another, the right to limiting instructions is waived if not requested at the trial. (*People* v. *White,* 50 Cal.2d 428, 430-431 [325 P.2d 985] ; *People* v. *Williams,* 202 Cal.App.2d 387, 396 [20 Cal.Rptr. 740].)

### 6. DENIAL OF MOTION FOR NEW TRIAL

Defendant contends that the court abused its discretion in denying the motion for new trial on the ground of newly discovered evidence. Prosecution witnesses Snare, the arson expert, and Ofner, the Volkswagen expert, testified that an engine compartment fire in a Volkswagen would cause the engine to stop running. Defendant, after judgment, moved for new trial on the ground that she had learned of two Volkswagen fires which she claimed completely contradicted the prosecution's witnesses on this subject and supported her

experts at the trial. Accompanying the motion were supporting affidavits.

Robert A. Blotter and James McGrain, in 1962, over two years prior to the instant fire, told of Blotter's Volkswagen having caught fire,[5] apparently from the engine, and being burned to a similar extent as defendant's car.

Neither the district attorney nor his witnesses ever contended that a Volkswagen could not catch fire. Their evidence was directed to the point that defendant's did not. The proposed after-discovered evidence was offered to prove that a Volkswagen could catch fire, which was not an issue in the trial.

A motion for new trial is a matter within the sound discretion of the trial court; such motions are looked upon with disfavor and unless there is a clear showing of abuse of discretion, the appellate court will not interfere. (*People* v. *Williams,* 57 Cal.2d 263, 270 [18 Cal.Rptr. 729, 368 P.2d 353].) Among other requirements is that: " 'it must appear . . . 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on retrial of the cause . . .' " (*People* v. *Williams, supra,* 57 Cal.2d 263, 270.)

The proposed evidence at most would have been merely cumulative of a point not disputed: that a Volkswagen can catch fire of its own accord. There was no error in denying the motion for new trial.

## 7. EXCUSING JUROR No. 5

On the third day of the trial, Juror Conway sent a letter to the trial judge. It read: "Until recently I felt that I could be a fair and impartial juror in the Miller case. I now find that it would be impossible for me to render a verdict of guilty against Mrs. Miller although the evidence might *indicate* that she is guilty. Under these circumstances, I feel that I should be disqualified from serving as a juror in the Miller case." [Italics added.] When this note was called to the attention of counsel, the district attorney moved that the juror be excused for cause and replaced by an alternate. Defense

---

[5]There was also the affidavit of Barton Keene, defense counsel's investigator, to which was attached a transcript of a conversation which he alleged he had with one Mrs. Mary Baker in which she informed him that her Volkswagen had caught fire in September 1964 in the motor compartment. Apparently defendant places no reliance upon this affidavit as a ground of newly-discovered evidence, as she does not refer to it in her brief. Obviously it is hearsay, and, in the absence of an affidavit by Mrs. Baker, could not be considered on the motion.

counsel said: "The juror has been listening to testimony now for some two and a half days, and it could very well be that his decision now is influenced quite a bit by some of the testimony that he has heard, so we'll object to him being withdrawn as a juror." The court made a finding of good cause for discharge, overruled the objection, and seated an alternate juror.

Defendant now contends that because the juror used the words, "indicate that she is guilty," he was not saying he could not return a guilty verdict if the evidence proved her guilty beyond a reasonable doubt, and therefore he should not have been removed. The letter, when read as a whole, does not support such an interpretation, particularly in view of the final sentence, in which the juror, knowing his own mind, says he feels that he should be disqualified.

Section 1073 of the Penal Code gives one of the grounds of challenge: ". . . existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party, which is known in this code as actual bias." The juror, in effect, said that he had such a state of mind.

Defendant apparently now contends that the court should have taken evidence from the juror. However, the record fails to show that any request for an examination of the juror was made by defendant. Moreover, in view of the juror's flat statement of bias in the letter, an examination of the juror would have been a waste of time.

In *People* v. *Taylor*, 189 Cal.App.2d 490, 495 [11 Cal.Rptr. 480], the court referred to Penal Code, section 1089, and said: "Under the section a juror may be substituted without jeopardy attaching if good cause for dismissal of the juror exists [citation]. What constitutes good cause rests largely in the discretion of the trial court. Where a juror states his doubt as to his ability to perform his duty justly good cause exists."

Juror No. 5 had no doubt on this subject.

## 8. DENIAL OF MOTION TO DISMISS INDICTMENT
### (GRAND JURY PROCEEDINGS)

Defendant moved under section 995 of the Penal Code for a dismissal of the grand jury indictment for lack of probable cause and alleged irregularities. The motion was denied by Judge Kerrigan. Defendant now contends that because, after denial of the motion, Judge Kerrigan later

accepted disqualification to try the case we should dismiss the indictment.

Defendant did not attempt to disqualify Judge Kerrigan at the hearing of the motion. On October 30, defendant moved Judge Kerrigan for a dismissal of the indictment under section 995, Penal Code. The hearing was then continued to November 4 in Judge Kerrigan's department. On that date defense counsel stated that he would not challenge the judge under the provisions of section 170, Code of Civil Procedure (the so-called peremptory challenge section), but, ''I am going to request that the Honorable Court disqualify itself on the hearing of my motion under 995.'' The district attorney opposed the request on the ground that no reason was given. The judge then ''respectfully denied'' the request, but pointed out that counsel had the right to challenge under section 170. Defense counsel then reiterated that he was not making a challenge but merely a request. Defense counsel then stated that as the court had already considered the evidence before the grand jury on a previous application for bail, he would submit the 995 motion. The court denied the motion. Defendant requested permission to then plead, and defendant's plea of not guilty was entered and the case set for trial. Later, pursuant to 170, the judge was challenged to prevent him from presiding at the trial. He granted the challenge and the case was transferred to another department where it was tried. Defendant, in effect, by failing to file a challenge of the judge, consented to his deciding the motion. Applicable here is the statement in *Calhoun* v. *Superior Court,* 46 Cal.2d 18, 32 [291 P.2d 474] : ''The contention that the trial judge was biased against Calhoun in ruling upon his motion to set aside the indictment does not affect the legal sufficiency of the evidence to justify the indictment . . .'' The test, on a motion under section 995, Penal Code, to set aside the indictment, is whether the defendant was indicted without reasonable or probable cause. ''Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused.'' (*Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 183 [281 P.2d 250].) The evidence before the grand jury showed probable cause and was such as would justify a reasonable person in believing that the fire which caused Dr. Miller's death was caused by defendant. The witnesses who testified at the trial: Snare, Robinson, McIntosh, Chaplin, Debra Miller,

156

Slagle, Davidson and Masarik, gave substantially the same testimony before the grand jury.

We proceed to the alleged irregularities occurring before the grand jury which defendant contends required a dismissal of the indictment.

The district attorney, in his opening statement to the grand jury, stated that when the highway patrol officer, deputy coroner, and a deputy sheriff, came to defendant's home the day of the burning of the car, they were met at the door by two of her attorneys and were refused permission to talk to her, and that her attorneys had advised quite a few persons, including Debra, defendant's daughter, not to cooperate. Likewise, a highway patrol officer testified that defendant's attorneys would not let him question her. There was no excuse for such statement, nor for the officer's testimony. Such actions were indefensible. However, in view of the testimony heard by the grand jury establishing probable cause, and the fact that the district attorney instructed the jury that its decisions must be based on the evidence adduced alone and not on anything he might say to them, it would be unreasonable to assume that but for the statement and the officer's testimony the grand jury would not have indicted defendant.

Witness Snare gave his opinion before the grand jury that the fire was of incendiary origin. The district attorney then asked, ''That means that someone deliberately started this fire?'' The witness replied, ''Yes.'' There was no impropriety in asking this question.

Also indefensible, but not of grave importance, was the district attorney's query of Debra Miller as to whether she was told by defendant's attorney to give the answer to one of his questions, which apparently he did not like.

The sheriff's criminologist, Davidson, testified to the amount of barbiturates he found in Dr. Miller's blood and that a person with that amount in his blood would at least be in a very deep sleep, and that with some barbiturates this amount would be nearly a lethal level. Davidson's testimony as to his training and experience in connection with barbiturates shows defendant's contention that Davidson was unqualified to testify in this respect to be unfounded.

### 9. PUBLICITY

Defendant contends that due to adverse publicity she was denied a fair trial. There can be no question but that in San Bernardino County the Miller case was a *cause celebre*. However, under all the circumstances, we do not believe that

the publicity attendant upon Dr. Miller's death deprived defendant of a fair trial. Moreover, it appears that defendant insisted on going to trial at that time and in San Bernardino County.

The first trial under the indictment commenced December 2, 1964. On December 7, the court granted defendant's motion for new trial based principally on a specific instance of adverse publicity occurring immediately before the first trial. Defense counsel then stated: "I feel, number one, that this matter would be better off if this matter were put off for some two or three months and my client let out on bail. In the alternative, then we must seek an early trial date as soon as possible, definitely before the 16th [the 90th day from the filing of the indictment] preferably starting next Monday, if possible." The district attorney then suggested that the trial be put over between 30 to 60 days "to give this furor a chance to die down." Defense counsel then said that he could not permit defendant to sit in jail another 30 or 60 days; that defendant was entitled to a trial within the 90 days of the filing of the indictment. The court then denied the motion for bail and set the trial date for January 11, 1965. Defense counsel then stated that he saw no reason why an earlier date of trial could not be had. The court explained that because of the holiday season, the jury coordinator would have difficulty in obtaining a representative group of citizens as jurors. Defense counsel then contended that defendant was not getting a speedy trial.

On December 21, the district attorney moved for a continuance of the trial date in order to appear at a hearing on a temporary restraining order obtained by defendant from the federal court. The court stated that it would continue the date of trial to January 25. Thereupon, defense counsel stated that if the court would reconsider and leave the date of trial at January 11, he would dismiss the federal court proceeding so that there would be no necessity for a continuance of this case. The date of January 11 was then reestablished.

The record shows that defendant sought no remedy for the publicity situation, asked for no change of venue, and instead of asking for delay to permit time to pass insisted on an early date of trial, except on the condition that she be released on bail. Defendant apparently weighed the question of adverse publicity against her reasons for desiring a speedy trial. It may very well be that the defendant considered that there was an advantage in her being tried while still pregnant.

The *voir dire* examination of the jurors selected indicates that the publicity concerning Dr. Miller's death had not affected them. Although all but one of them had read something about the case, none of them had formed or expressed an opinion concerning defendant's guilt or innocence. None of them had read the articles which were concededly adverse to defendant and had caused the new trial. In *People* v. *Duncan*, 53 Cal.2d 803, 812 [350 P.2d 103], where the court upheld the trial court's denial of a motion for change of venue, the court said: "Even if it be assumed that many persons formed opinions unfavorable to defendant as a result of what was published, it does not follow that persons without such views could not be found to act as jurors or that those who had adverse opinions would be unable to set them aside and try the case fairly on the basis of the evidence to be produced in court."

"The mere fact that veniremen had read articles about the arrest would not necessarily require a change of venue." (*People* v. *Saugstad*, 203 Cal.App.2d 536, 546 [21 Cal.Rptr. 740].)

The jurors in this case all said they had open minds and would decide the case on the evidence produced without regard to any outside considerations.

Although the jurors had been aware of the earlier publicity, they did not remember the particulars, had formed no opinions, and those who had heard opinions expressed stated that they would not be influenced by any opinions they had heard. Moreover, defendant exercised only one-half of the peremptory challenges to which she was entitled and did not raise the question of adverse publicity at the trial.

Defendant complains of an order of the trial judge to the effect that transcripts of the proceedings on the motion for mistrial which contained the newspaper articles which brought about the mistrial would not be included in the record on this appeal, and requests that we order them brought up. We see no reason for doing so. None of the jurors selected to try the case on the second trial had read these articles, and in view of all the answers on *voir dire* of these jurors and defendant's failure to raise the question of publicity, it would appear that the matter of publicity was water under the bridge.

In *People* v. *Modesto*, 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753], the court, in upholding the trial court's refusal to grant a motion for change of venue or ordering a change of venue on its own motion, considered important the fact that

there appeared no difficulty in securing jurors who were not aware of the earlier publicity and the facts that defendant did not exhaust his peremptory challenges nor renew his motion which had been denied without prejudice. The court held that from all the circumstances the trial court could reasonably conclude that the defendant could secure a fair trial in the county.

In *People* v. *Parker*, 235 Cal.App.2d 100 [44 Cal.Rptr. 909], the court refers to the publicity problem in these words: "Defendant's objection to trial hard upon the heels of unfavorable publicity evokes a problem of widespread interest. The frequently conflicting demands of fair trial and free news dissemination are currently the subject of soul-searching by the judiciary, the organized bar and the responsible publishers and broadcasters. A salient phase of the problem is assurance of fair trial by an impartial jury selected in a community atmosphere which may have been preheated by unfavorable pretrial publicity." and, *inter alia*, the opinion states: "California law evinces a policy permitting acceptance of jurors who, after contact with pretrial news reports, commit themselves to impartiality and fairness. (Pen. Code, § 1076; *People* v. *Duncan*, 53 Cal.2d 803, 812-816 [350 P.2d 103]; *People* v. *Daugherty*, 40 Cal.2d 876, 889-890 [256 P.2d 911].)" In that case the defendant had not renewed his motion for a continuance because of the publicity, just as in our case defendant made no motion for continuance of the second trial. What the court then said is applicable here: "We have carefully read the transcript of the impanelment proceeding. It must have convinced counsel, as it convinces us, that whatever the news stories actually said, they did not really create an emotional climate substantially impeding selection of an impartial jury." [P. 106.]

Judgment affirmed.

Coughlin, Acting P. J., and Whelan, J., concurred.

A petition for a rehearing was denied October 20, 1966, and appellant's petition for a hearing by the Supreme Court was denied December 14, 1966.