[Crim. No. 5136.  In Bank.  Apr. 27, 1951.]

THE PEOPLE, Respondent, v. JERRY NEWSON,
Appellant.

Edises & Treuhaft, Bertram Edises and Robert E. Treuhaft for Appellant.

Fred N. Howser, Attorney General, Clarence A. Linn, Deputy Attorney General, J. Frank Coakley, District Attorney, Laurence E. Dayton, Assistant District Attorney and John S. Cooper, Deputy District Attorney, for Respondent.

EDMONDS, J.—Jerry Newson was convicted of murdering Marjorie Wilson and Robert Savage. The jury found each of the crimes to be of the first degree and, pursuant to the verdicts, sentences of death were imposed. The principal ground relied upon as requiring reversal of the judgments and the order denying a new trial concerns the evidence identifying Newson as the person who committed the homicides.

Savage and Mrs. Wilson were found dead in a drugstore. Each of them had been shot with a .45 caliber automatic pistol. The bullets entered the backs of the heads and emerged from the foreheads. The bullets and empty casings were recovered from the scene. Approximately $600 was missing from the store's cash register. The bodies were lying on the floor behind a partition which extended across one end of the store to form a prescription room. At approximately the center of this partition there was a "prescription window" 1 foot, 6 inches high, and 3 feet, 7 inches wide.

The bodies were discovered about midnight. The front door to the store was locked on the inside with the keys still in the

lock. The murderer had escaped through a rear door by prying off a hasp. Conditions of the room indicated that the victims, the pharmacist-manager and a salesgirl, had been attacked while they were engaged in counting the day's receipts and closing the store for the night. Mrs. Wilson usually left about 9 p. m., which was the regular closing time.

The circumstances of the crime pointed to the killer as someone sufficiently well known to the victims to be admitted, or permitted to remain, after the closing hour. However, it is equally possible that he secreted himself upon the premises until after the doors were locked. Newson was familiar with the store and well known to Savage.

Three days after the homicides were committed, Newson was arrested and accused of having robbed the business office of a housing project in which he lived. A .45 caliber automatic pistol was used and $1,275 taken. At first he denied that he had committed the robbery. In the course of being examined about it, although the drugstore murders had not been mentioned, he asked the penalty for robbery and the penalty for a robbery in which someone was killed. When his inquiry was answered, he admitted the housing project holdup, but claimed that he had used a wooden gun which he threw in the estuary.

Two days after his arrest, Newson was questioned and a so-called lie detector was used. There is some conflict as to what occurred at that time. According to the testimony of Albert E. Riedel, a police officer, Newson freely consented to the interrogation.

Riedel told the jury that after asking several questions relating to the housing project robbery, he stood in front of Newson and said, ''Now we know you used a real .45 in the Harbor Homes Project job, right?'' Newson replied, ''Yes.'' As Riedel related later conversations, he told Newson he would like to administer another test and question him about the drugstore murders. Newson consented, and when the test was completed Riedel again walked around in front of Newson, drew up a chair and said, ''I am very sorry that you pulled that job at the drug store. I am very sorry. I would be very sorry for anyone that had gotten themselves into as much trouble as you did.'' Riedel and Newson sat for a while without speaking and again Riedel said he was very sorry for him. Newson then ''looked over toward me and said, 'Yes, you are right, I killed them. I killed the two people

in the drugstore.' And then he turned and put his head in his arms so I could not see his face.''

Other testimony by Riedel was that he then left his office to speak with some police officials. He returned about five minutes later and told Newson he would like to make another test and ask some questions concerning the whereabouts of the gun. After completing the test, Riedel walked around in front of Newson, who looked up and said, ''Now, you know where the gun is.'' Riedel then told him he would make another report to the inspectors. Newson replied: '' 'Well, go ahead, go tell them if you want to, but I was just kidding.' I said, 'Wasn't it true?' I said, 'Kidding?' And he said, 'Yes, just kidding you,' and I said, 'O.K.' and walked out of the room.''

As a witness in his own behalf Newson said that he submitted to the tests because of threats by Riedel to the effect that he could take the test or face the ''hard boys'' of the police department who would be ''getting it the hard way.'' As he related the story of his examination at police headquarters, Riedel ''asked me did I kill those people in the drug store and I asked him what he was talking about, and he said, 'You know very well what I am talking about,' and I said I didn't, and then he started the questioning over and over and stopped the machine and started it again and started questioning over and over. . . . he kept pounding his finger in my face and kept telling me I killed those people and I kept telling him I didn't. . . . After he couldn't get nothing out of me he stopped, and then he started up again and the same thing over and over. . . . Finally he made me mad and I said, 'All right, I killed somebody, does that make you feel better?' And he turned red in the face and he turned around and shook his head and he walked out the door and after that there was a room full of reporters and different photographers.''

After this questioning of Newson, and on the same day, a .45 caliber automatic pistol was found in the automobile owned by Newson's uncle. Newson identified it as the one he had used in the housing project robbery.

The record also includes the testimony of Inspector Riedel concerning a later conversation. At that time, said Riedel, while examining him further about the gun, Newson said: ''Why don't you ask where the money is?'' Riedel asked, ''All right, Jerry, where is the money?'' Newson replied, ''That is just as hot as the gun.''

In a statement to the district attorney, Newson admitted being in the drugstore the night of the murders, but claimed he was sent by Mrs. Wilson to buy some barbecued spare rib sandwiches and was on this errand at the time the murders were committed. Riedel testified that he was present at the time this statement was taken and questioned Newson as to the truth of the story. He said he asked, ". . . if you told me the truth about . . . [the sandwiches], you would admit again to me that you did the job at the drug store, is that right?" Newson did not reply, Riedel told the jury, but nodded his head in the affirmative.

At the trial, Newson declared that he did not go near the drugstore on the night of the murders and had never been in the prescription room of the pharmacy. His testimony concerning his whereabouts when the homicides were committed was corroborated in essential respects by five witnesses.

A ballistics expert stated that, in his opinion, the gun recovered from the car of Newson's uncle was the one which fired the fatal shots. However, two criminologists of the police department, called as witnesses for the defense, told the jury that they were unable to determine, after about 10 days' continuous examination and the comparison of 15 test bullets, whether it was the murder weapon.

Barbara Cruikshank, an acquaintance of Newson, was the principal witness for the prosecution. She said that on the night of the murders she passed the drugstore at about 8:50 p.m. The store was open and she spoke to Savage and Mrs. Wilson. She then walked approximately one and one-half blocks to a cleaning establishment and asked for a woman employee. Her friend was not there, and she then stopped at a cab stand and talked with someone.

According to Miss Cruikshank, she then retraced her steps and approached the drugstore. The district attorney asked her: "Now, as you went up to the front of the store at that time to what part did you go?" The reply was: "I refuse to answer that question." When asked why she would not reply, she said: "Because I do. I am in court now and this is the truth, everything I am saying, and I don't have to answer it if I don't want to." The trial judge remarked that he thought Miss Cruikshank should have counsel to advise her. She then said: "That is the reason I am in this today, all on account of what somebody said. 'If you don't say this, you are going to get in jail. If you don't say this,

you are going to go to jail.' Now they are trying to build me up that I was with the boy that killed him."

The following day Miss Cruikshank was recalled to the stand and stated that, on her return trip, as she approached the front door of the drugstore, she looked in. The lights in the main portion of the store were on. She was asked: "Did you see anyone when you looked in the store at that time?" Miss Cruikshank said she did not, and was then asked if she looked in the direction of the window leading to the prescription room. Her reply was in the affirmative. The district attorney asked: "When you looked in the direction of the prescription window, state whether or not you saw anyone at all at that time?" Miss Cruikshank answered: "No, I didn't."

Over objection, the district attorney was permitted to impeach the witness by use of prior inconsistent statements. This evidence includes her testimony at the preliminary examination and two statements made to the assistant district attorney. At each of these times, as her testimony is shown by the record, when she looked through the glass panel of the door she saw someone in the prescription room. She also said in peering through the glass she struck her head against it and the person in the prescription room turned and faced her. She recognized that person as the defendant Newson.

Miss Cruikshank admitted the prior statements, but said that they were false and had been made because of threats to charge her as an accessory to the murders. She stated that the first of them was given during extensive questioning by the police who ". . . came and got me without my mother's permission and took me up—not to the City Hall, but to the garage there on 13th and Jefferson at 8:30 and I didn't get home until four o'clock Saturday morning."

The admissibility of the statements of Miss Cruikshank, which were presented to the jury as the basis for impeaching her testimony, is the principal question presented by the appeal. But Newson also contends that the jury was erroneously instructed in regard to the statements he made while undergoing the "lie detector" tests. These statements, he asserts, were treated by the court as confessions. He also complains of the admission of evidence concerning the housing project robbery.

In support of the motion for a new trial, it was charged that evidence in regard to the existence of an unidentified set of fingerprints upon a metal cash drawer found on the

prescription counter near the victims was suppressed by the prosecution. This evidence, it was alleged, shows that they were not made by Newson and all other fingerprints found in the prescription room were identified as those of employees or other persons having legitimate business in that vicinity. These facts, according to the affidavit of counsel for Newson, were not discovered until after the trial despite the use of due diligence. The assertedly prejudicial misconduct of a juror in reading false, inflammatory and improper newspaper accounts of the trial, and in violating the court's order regarding her duties, was also stated as a ground for a new trial.

The right of a party to impeach his own witness is the subject of extensive legal writing and has been considered in numerous decisions. Such impeachment generally was forbidden under the Roman law, as appears inferentially from the Code Justinian. English common law followed the same rule. (3 Wigmore, Evidence [3d ed. 1940], § 896 et seq.; *Crago* v. *State*, 28 Wyo. 215 [202 P. 1099].) The first case in this country upon the subject is *State* v. *Norris*, 2 N.C. 429 [1 Am.Dec. 564], in which the court held that the state may produce contradictory statements of its witness. However, in 1806, the doctrine was repudiated. (*Sawrey* v. *Murrell*, 3 N.C. 397.) Since those early years, exceptions have been engrafted upon the rule to prevent injustice when a party who calls a witness is surprised or entrapped by one who gives adverse testimony.

In 1872, the California Legislature enacted section 2049 of the Code of Civil Procedure, which provides: "The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony. . . ."

However, the prior statements inconsistent with the witness' present testimony can only be considered for the purpose of neutralizing and counteracting the effect of his statements upon the trial.

The purpose of the statute is to allow a party to wipe out, as nearly as possible, the evidence which has been given. Where a witness states no fact against the party calling him, there is nothing to counteract. The testimony which may be contradicted must be prejudicial and detrimental, otherwise the previous statement shown would stand out, not as offsetting contrary testimony already given, but as substantive evidence of a fact.

In the case of *People* v. *Jacobs,* 49 Cal. 384, the prosecution endeavored to show that the defendant had made threats that he would commit the offense charged. The witness denied having heard such threats or that he had told one Dunton of hearing them. The trial court permitted the prosecution to impeach its witness by having Dunton testify that the witness had told him of such threats having been made by the defendant. Upon appeal, the conviction was reversed, this court saying: ". . . though the witness had failed to testify to all the prosecution expected or desired, he had not, as a witness for the prosecution, testified against the prosecution or to any matter advantageous to the prisoner." (49 Cal. at 385.)

The judgment was also reversed in *People* v. *Mitchell,* 94 Cal. 550 [29 P. 1106], for the reason, among others, that the prosecution had been permitted to impeach its own witness by the use of prior contradictory statements. "This was error. A witness, whichever party calls him, cannot be impeached unless he has given testimony against the impeaching party. This witness had not testified against the prosecution. He simply failed to testify to a fact which the district attorney thought he could prove by him. . . . The impeaching statements were evidently desired as evidence. If such testimony were admissible, it would be easy to manufacture evidence of that kind. If a witness merely fails to testify as expected, that does not authorize the party calling him to prove that the witness had elsewhere made the desired statements. It is only when he has given damaging testimony that he can be impeached." (94 Cal. at 556.) To the same effect is *In re Kennedy,* 104 Cal. 429, 431-432 [38 P. 93].

In a prosecution for criminal libel, the defendant called a witness and asked him if he had not, upon certain occasions, stated that he had instituted the prosecution of the defendant at the instance of others. The witness answered that he had made no such statement. Impeachment was not permitted. The ruling, said this court, was clearly right. "It was an attempt by a party to impeach his own witness, not because that witness had given hostile evidence which had taken him by surprise, but because he did not admit what was sought to be elicited from him." (*People* v. *Crespi,* 115 Cal. 50, 55 [46 P. 863].)

*People* v. *Godwin,* 123 Cal. 374 [55 P. 1059], was an appeal from a judgment of conviction for seduction of a female of previous chaste character, under a promise of marriage. The defendant called one St. Clair who, in answer to a direct

question, testified that he had never had intercourse with the prosecutrix. St. Clair was then asked if he had not, at certain times, made statements to the contrary. Objections were sustained to these questions and upon appeal this court held: "The action of the trial court has full support in the law. It is only when the witness gives hostile evidence that a party may impeach him by showing contradictory statements made at other times. The answer of the witness being 'no,' the evidence was purely of a negative character. It was neither favorable to one side nor the other, and, if the witness had been impeached, the case before the jury would have assumed no different aspect." (123 Cal. at 375.)

The testimony challenged in *People* v. *Creeks*, 141 Cal. 529 [75 P. 101], was quite similar to that in the present case. Highly important evidence against Creeks related to tracks leading to and from the place of homicide, which were apparently made by shoes similar to those found in the defendant's room. The defendant's mother, called as a witness by the prosecution, testified: "I could not tell you what shoes he had on when he went hunting. I cannot swear positively what shoes he had on." She was then asked whether, at the preliminary hearing, she testified that her son was wearing the shoes in question when he left home. She replied that she had so testified, adding, "but it was a mistake; for I didn't notice them on his feet after dinner." She also admitted having told the coroner that her son wore the shoes during the whole day of the homicide. In reversing the judgment, the court stated: "The evidence thus elicited over the objection was incompetent for any purpose. . . . The testimony was sought to be elicited solely for the purpose of getting before the jury statements made by the mother on a prior occasion, tending to make out the case of the people. Where a witness called by a party has simply failed to testify to all that party expected or desired, but has not given testimony *against* him, it is not permissible for the party calling him to prove that such witness had previously made statements which, if sworn to at the trial, would tend to make out his case." (141 Cal. at 531, 532.)

Another case where evidence, much the same as that admitted against Newson, was considered is *People* v. *De Witt*, 68 Cal. 584 [10 P. 212]. Vincent, a witness called by the prosecution, was asked whom he had seen watching the house where the homicide was allegedly committed by the defendant. Vincent answered: "I saw some person standing at a

distance, but I could not recognize him at the time, and I can't make any statement about who the party was." The court stated that the trial judge ". . . erred in permitting witnesses to testify to statements made by the witness Vincent that he saw the defendant near the house where the alleged homicide was committed, on the night of the homicide." (68 Cal. at 587, 588.)

The testimony of Barbara Cruikshank falls directly within the rule applied in these cases. It was in no way damaging to the prosecution's case. In substance, she testified that she passed the drugstore, looked through the glass panel of the closed door, and saw no one. She did not say that Newson was not there, nor did she say that no one was in the store. The exact time at which Miss Cruikshank looked in the store is not shown by the record. She said that she first passed the store at 8 :50 p. m., when she was on her way to a cleaning establishment approximately one and one-half blocks away. There is no evidence as to how long she stayed at the cleaning shop or at the cab stand near by. She testified that some time later, when she again passed the drugstore and looked in, she did not see anyone. As stated in *People* v. *Godwin, supra,* ". . . the evidence was purely of a negative character. It was neither favorable to one side nor the other. . . ." Her testimony was not adverse to the prosecution. There was nothing to be neutralized or counteracted, and accordingly no basis for impeachment.

The attorney general contends that the defendant is precluded from claiming this error because of failure to object upon the specific ground that the testimony was not adverse. Although counsel did not present his objection as precisely as it might have been stated, he placed it upon the ground ". . . that the basis for cross examination of your own witness and trying to impeach a witness that you brought into court and vouched for *is surprise and not merely the fact that perhaps the witness does not say exactly what you expect her to say."* (Emphasis added.) It does not appear that the form of the objection misled anyone. In substance, counsel urged that impeachment upon the ground of surprise was improper because the prosecution had shown no more than that the witness failed to testify as expected.

To affirm the judgment of the trial court, despite the admission of the impeaching statements, this court must determine that, considering the entire record, the error did not prejudice the defendant's rights. (Const., art. VI, § 4½.)

If it cannot be said that, in the absence of the error complained of, a different verdict would have been improbable, the erroneous ruling constitutes a miscarriage of justice within the meaning of the constitutional provision. (*People* v. *Hamilton*, 33 Cal.2d 45, 51 [198 P.2d 873] ; *People* v. *Rogers*, 22 Cal. 2d 787, 807 [141 P.2d 722] ; *People* v. *Putnam*, 20 Cal.2d 885, 892 [129 P.2d 367].)

There were no eyewitnesses to the homicides of which Newson was convicted. The only physical evidence connecting him with them is the gun found in his uncle's car and the bullets and empty casings recovered from the prescription room. Although one ballistics expert was of the opinion that the fatal shots were fired from this gun, two other criminologists found it impossible to make a positive identification of them. Newson's conviction of the housing project robbery was received to show his prior possession of the alleged murder weapon and, the attorney general contends, to prove that he "was motivated by an intention to obtain funds by armed robbery" and "his additional motive to use violence if necessary to escape identification and apprehension." Newson's alleged confession was immediately repudiated and denied at the trial.

The evidence concerning the circumstances under which the statements were made is highly conflicting, and the truth and genuineness of them was a major issue before the jury. Although Newson was shown to have been in the vicinity of the drugstore on the night of the homicides, he denied that he was in the store or had ever entered the prescription room. There is no substantive evidence to the contrary. Barbara Cruikshank's testimony at the trial did not place Newson in the store or prescription room.

At the close of Barbara Cruikshank's direct examination, the attorney for Newson asked that the court then admonish the jury that the statements "do not in themselves constitute testimony but are merely used for the purpose of impeaching present testimony." The court refused to do so, saying, "That is the general law on the subject and it will be covered by instruction when the case goes to the jury and the Court instructs as to the law applicable." Nearly three weeks later, the court charged the jury: "In respect to any attempt to impeach a witness by showing that on some former occasion he made a statement or statements that are contradictory of his testimony here, you are instructed that the evidence of any such contradictory statement is not received for the pur-

pose of proving the truth of what then was said, but only for the purpose of testing the credibility of the witness; you are permitted to consider said evidence only for that reason. . . .''

▉ Under the circumstances shown by the record, it cannot reasonably be concluded that the prejudicial effect of erroneously admitting the impeaching statements was cured by the court's instructions. Although the jury was charged that the evidence as to Miss Cruikshank's prior statements could be considered solely for the purpose of impeachment, she did not give any testimony which needed to be counteracted or neutralized. ''Hence the only purpose that could be subserved by reading into the record the previous statements made, and the only effect that this could have, would be to cause these statements, which were hearsay, to appear to the jury as substantive evidence, the highly prejudicial effect of which is clear.'' (*Crago* v. *State, supra,* at p. 229.) Her statements ''. . . must have operated with telling effect upon the jury.'' (*People* v. *Creeks, supra,* at p. 533; *cf. People* v. *Flores,* 37 Cal.App.2d 282 [99 P.2d 326].)

▉ When the case against a defendant is a close one, an error which otherwise would not be prejudicial may justify a new trial. (*People* v. *Zemavasky,* 20 Cal.2d 56, 62 [123 P.2d 478].) ▉ Considering the entire record with particular attention to the nature of Newson's statements when questioned, the evidence concerning the means by which they were obtained and the presentation to the jury of all the details of the housing project robbery, Newson's guilt was not so clearly established that, in the absence of the impeaching evidence, a different verdict would have been improbable.

In addition to the evidence offered for purposes of impeachment, other testimony was also improperly received. Over objections, witnesses were allowed to recount the details in regard to Newson's commission of the robbery at the Harbor Homes Housing Project. The testimony was offered upon the theory that it shows his prior possession of ''the same kind and caliber of weapon'' as used to commit the homicides, his motive to obtain funds by armed robbery and, if necessary, to escape identification and apprehension by resort to violence. The evidence as to the careful planning and execution of the housing project robbery is said to further indicate a common scheme and plan to commit such crimes. The attorney general also argues that Newson's statements concerning the details of that robbery show his ''own inner personal

knowledge of his guilt of *both* the Harbor Homes robbery and the murders with which we are here concerned''; that is, ''Newson's consciousness of his own guilt of the murders.''

For these purposes, the housing project robbery was reenacted before the jury in minute detail. Testimony was given tending to prove how Newson planned the robbery and stole two pieces of clothesline with which to tie the office employees. It was shown how he placed the implements of crime in a brown bag, donned a mask and put on gloves. An employee of the housing project recounted Newson's entrance to the business office by climbing over a glass partition, told how he tied members of the staff, described his every act and related each statement made by him during the robbery. In addition to stating that Newson used a pistol ''of the same kind and caliber'' as the murder weapon, a witness was permitted to tell when and how he loaded the pistol, at whom he pointed it, and to recount all of his remarks and threats concerning its use.

██ ''A defendant in a criminal action cannot be required to defend himself against the charge of any crime other than that for which he is on trial, but this rule does not exclude evidence which incidentally discloses the commission of another offense. Evidence which is relevant in establishing guilt of the crime charged is admissible notwithstanding the fact that it tends to connect the accused with an offense not included in the charge.'' (*People* v. *Dabb,* 32 Cal.2d 491, 499 [197 P.2d 1]; *People* v. *Peete,* 28 Cal.2d 306, 314-315 [169 P.2d 924].) ██ But this rule must be exercised with extreme caution for the natural tendency of the jury is to give excessive weight to a defendant's vicious record of crime. For this reason, it has been said: ''The relevancy of evidence that proves crimes other than that charged must, of course, be examined with care, due to the prejudicial nature of all such evidence, and it should not be admitted simply on the showing that some part of that transaction is relevant to the case. *The possibility of severing relevant from irrelevant portions should, in every case, be considered, thereby protecting the defendant against reference to other crimes where it has no tendency to establish facts pertinent to the proof of the crime charged.*'' (*People* v. *Dabb, supra,* at p. 500.) (Emphasis added.)

Tested by these principles, much of the evidence concerning the housing project robbery is not relevant to the homicides of which Newson was convicted. Upon a new trial,

careful consideration should be given to this evidence and all of it excluded which does not comply with the legal requirements. ▮▮▮ However, the exclusion of circumstances surrounding the relevant facts cannot go so far that the jury is ". . . unable to view the essential facts in their true perspective and thereby properly evaluate the weight of the evidence." (*People* v. *Dabb, supra,* at p. 500.)

The judgments and the order denying a new trial are reversed.

Gibson, C. J., Carter, J., Traynor, J. and Schauer, J., concurred.

Spence, J., concurred in the judgment.

SHENK, J.—I dissent. The evidence introduced by the prosecution to impeach the testimony of its witness Barbara Cruikshank was properly admitted. At the preliminary hearing she unequivocally stated that as she passed the store someone was in the lighted prescription room, that that person had turned towards her, and that that person was Jerry Newson. At the trial she testified that she had looked in the store but had seen no one. The prosecution was thus taken by surprise. Her testimony at the trial was not purely negative in character as it would have been had she testified that she did not know whether anyone was in the store because she had not looked. Such testimony constituted an affirmative declaration that there was no one in the store visible to her. Since it was the contention of the prosecution that the homicides had been committed at the time she had theretofore stated that she had seen the defendant in the store her subsequent testimony was certainly damaging and subject to impeachment.

The majority opinion incorrectly infers that there was a delay in instructing the jury as to the proper use of the impeaching evidence. When counsel for the defendant asked that the jury be informed that the prior contradictory statements did not constitute present testimony but could only be employed to impeach present testimony, the court declared that the law was as stated in that request. A formal instruction to the same effect was later given. The jury was thus twice informed as to the limited effect of the impeaching testimony. The jury was specifically told, ". . . you are instructed that the evidence of any such contradictory statement is not received for the purpose of proving the truth of

what was then said, but only for the purpose of testing the credibility of the witness; you are permitted to consider said evidence only for that reason. . . .'' The impeaching evidence was admitted solely to cast doubt on the veracity of the witness' present testimony which was contrary to her previous statements that she had seen no one in the store when she peered into it at the time the murders were claimed by the prosecution to have been committed. That the jury so considered the evidence is the only reasonable assumption. Its admission was not error.

Having declared that error was committed, the majority opinion then concludes that a miscarriage of justice has resulted if it cannot be shown that a different verdict was improbable. The language of the constitutional provision itself should govern. It provides that no judgment shall be set aside ''unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'' That provision clearly calls for a realistic appraisal of the entire record on a case-by-case basis to determine whether in the presence of error a miscarriage of justice has occurred. Here there was no error. Even if there were the record makes it clear that no miscarriage of justice has resulted from the judgment of conviction.

The defendant's presence at the scene of the crime at the probable time of its commission was sufficiently established by the evidence. Independent witnesses testified that the defendant was in the immediate vicinity about 8:40 p. m. on the night in question. Barbara Cruikshank, the witness whose hostility to the prosecution was apparent, testified that she had spoken to the victims about 8:50 p. m. and that at about 9 p. m. the defendant's car was parked next to the door later identified as that from which the murderer's exit was made. It was shown that it was the regular habit of the slain salesgirl to leave the store about 9 p. m., the usual closing time. An expert testified that the gun used by the defendant in the housing project robbery, and one to which he had access, was the lethal weapon.

The majority opinion concedes that evidence of the housing project robbery was admissible to show the defendant's ownership of a gun of the same caliber as that used in the homicides. It cannot rightly be said that proof of certain details of that robbery were improperly admitted. Those details were not

of such a nature as to increase the danger of prejudice beyond that created by the admittedly competent proof of the commission of that crime.

The defendant's own statements and conduct at various times subsequent to his arrest definitely establish his guilt. At the trial he offered an entirely different explanation of his whereabouts at the time of the crime than that twice given to investigating officers. His change in position occurred after his original "alibi" had been exploded. His explanation was that he had been confused when he gave the first version yet it was one he chose to tell a second time after a steak dinner and a good night's sleep. The witnesses on whom he relied to establish the second version were impeached as to statements indicating that Newson had been with them in the period around 9 p. m.

At a time when the defendant was being questioned only in regard to the housing project robbery and before the drugstore crime had been mentioned he asked what the penalty was for robbery. On being informed of the penalty in such cases he inquired as to the penalty imposed if someone was killed in a robbery. When informed that in that case the penalty was death or life imprisonment, he hesitated and then confessed to the housing project robbery.

The defendant was given several "lie detector" tests to which he offered no objection. He was told that one test was designed to reveal whether he had used a real gun in the housing project robbery. At its conclusion an officer told him that they thus knew that he had used a real gun and the defendant then for the first time conceded this fact. He was told that the next test would determine whether he had committed the drugstore crime. The officer testified: "After that test was completed I walked around in front of the defendant again . . . and I said to him. 'I am very sorry that you pulled that job at the drug store.' He was sitting at the . . . desk . . . and when I said that, he put his head forward so that he cradled his head in his arm and we sat there for a short while looking at each other, and I said to him again, 'I am very sorry. I would be very sorry for anyone that had gotten themselves into as much trouble as you did," and he kept sitting there and not saying anything, and we just sat there for a little while and then I said to him again I was very sorry for him, I would be sorry for anyone that got into as much difficulty as he apparently had gotten into, and then he looked over toward me and said, 'Yes, you are

right, I killed them. I killed the two people in the drug store.' And then he turned and put his head in his arms so I could not see his face . . . I sat there for a while and he continued to put his head in his arms across the top of the desk, and after a short while I said to him, 'Do you care to talk about it' and he shook his head, so we waited a little while longer and I said: 'How did you get into the store?' and he said, 'They let me in the front door.' Then I said, 'How did you get out of the store', and he said, 'I went out the back door.' I said, 'How did you do that?' and he said that was very easy and he put his hands together like that (indicating) and made a motion up.'' In view of the evidence of the defendant's admission that he had committed the murders the jury was justified in rejecting his later explanation that throughout his interrogation he was merely "kidding."

The defendant was asked by an officer if his later inability to reconcile an inconsistency in his alibi explanation was not due to the fact that he would thus again admit he had committed the drugstore crime. The defendant looked around the room and then slowly nodded his head in the affirmative. The defendant informed a fellow prisoner that he had spent the evening of the drugstore murders with a girl named Cruikshank who knew what had happened and knew how to keep her mouth shut.

There is abundant evidence in the record to establish the defendant's guilt. He had a full and fair trial and the judgment of conviction should be affirmed.

Respondent's petition for a rehearing was denied May 24, 1951. Shenk, J., voted for a rehearing.