[Crim. No. 6239. First Dist., Div. One. Feb. 19, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES MAR-
SHALL ADAMS et al., Defendants and Appellants.

Ronald H. Kahn, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Michael J. Phelan and James A. Aiello, Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—Defendants Adams and Clegg have severally appealed from judgments of conviction which sentenced each

to state prison following jury verdicts which found both guilty of burglary in the second degree. (Pen. Code, §§ 459-460.) Each contends that the evidence is insufficient to sustain his conviction, and that the court prejudicially erred in permitting the prosecutor to impeach a witness called for the People by the use of a prior inconsistent statement which incriminated the defendants. A further contention, that each was wronged by the failure of the court to grant his motion for new trial, is encompassed within the foregoing contentions and needs no separate consideration.

An examination of the record reveals ample evidence to support the convictions, and establishes that although there may have been irregularities in permitting the impeachment of the witness, and in the manner in which the impeachment was conducted, there was no prejudicial error. The judgment must be affirmed.

*Sufficiency of the Evidence*

At about 5:25 a.m., on August 14, 1966, Humboldt County Deputy Sheriffs Gritts and Ayer observed a man apparently fleeing[1] from the Blue Lake Speedwash, in Blue Lake, California. The officers drove to the door of the laundromat, observed, without leaving their patrol car, that the door was standing open and had been "hacked up," and then followed and stopped the car entered by a fleeing person.

When the officers stopped the car, which they testified they had constantly kept in view, after seeing it in the parking area of the laundromat, and which they stated was the only car they observed on the road that morning, they observed defendant Clegg, the man they identified as the person they had seen fleeing from the laundromat in the driver's seat, defendant Adams in the rear seat behind the driver, and two women, one in the front and one in the rear seat. The officers, aided by other members of the deputy sheriff's staff who had responded to a call for assistance, placed the occupants of the car under arrest. In the ensuing search of the defendants, and the interior of the car they found 23 dimes, one nickel, and one penny on defendant Clegg, six quarters, three dimes, three nickels and three pennies on defendant Adams, three screwdrivers, one with a sharp point, a solid metal hammer and a kitchen knife on the floor behind the driver's seat, and

---

[1] Officer Gritts testified that he saw the man, whom he identified as defendant Elmer Donald Clegg, actually exit from the laundromat and enter a 1955 Pontiac parked in front of the laundromat. Officer Ayer testified that when he first saw defendant he was within 5 feet of the door of the laundromat, running in a straight line from it.

a pair of leather gloves either on the front or rear seat.

At the trial, the owner of the Blue Lake Speedwash testified that he was at his laundromat on August 13, 1966, at 3 or 4 p.m., and that he emptied the coin boxes of the various washers, dryers, soap and coffee machines. He indicated that his examination of the machines, following the burglary, showed that exactly $2.30 worth of dimes were missing from a soap dispensing machine that he had not emptied. He declared he could calculate the number of dimes from the number of soap boxes missing from the machine. He also testified that a hair dryer took quarters, but since it belonged to the vending machine company he could not say how much was missing from it.

An employee of the laundromat testified that on the evening of August 13, 1966, she came to the laundromat, cleaned it, and closed the premises at about 11 p.m. She indicated that no one was inside the laundromat when she left, and that all of the windows and doors were locked.

At the trial, Carolyn Faye Poole was called as a witness by the district attorney. Miss Poole was one of the women arrested with the defendants. She indicated that she and defendant Adams were asleep in the car during the time of the alleged burglary, and that if the burglary had taken place it was unlikely that she would have been able to sleep through it. She also testified that the defendants had used the tools found in the car to work on the generator or voltage regulator of the car. The district attorney was allowed to impeach this witness on the basis of a prior inconsistent statement given to him on October 20, 1966. The circumstances of the impeachment will be considered in a discussion of that issue.

The defendants did not testify or offer any evidence in their own defense.

The defendants, in challenging the sufficiency of the evidence, rely upon those pronouncements in *People* v. *Hall* (1964) 62 Cal.2d 104 [41 Cal.Rptr. 284, 396 P.2d 700], which require the reviewing court to reject " 'inferences sought to be derived from weak and inconclusive sources' " when they are contrary to " 'otherwise indubitably established facts.' " (62 Cal.2d at p. 110; and see *id.*, p. 112; and *People* v. *Singh* (1936) 11 Cal.App.2d 244, 250-254 [53 P.2d 403].) They contend that the verdicts against them are predicated upon mere conjecture and suspicion. (*People* v. *Garcia* (1962) 201 Cal. App.2d 589, 594 [20 Cal.Rptr. 242] ; *People* v. *Rascon* (1954) 128 Cal.App.2d 118, 122 [274 P.2d 899] ; *People* v. *Alkow*

(1950) 97 Cal.App.2d 797, 802-803 [218 P.2d 607] ; and *People* v. *Draper* (1945) 69 Cal.App.2d 781, 786 [160 P.2d 80].)

Attention has been directed to inability of the officers to detail the number and identity of the occupants of the automobile when it was at the scene of the crime. The evidence does show that the car was kept under surveillance for substantially all of the time when it was first observed until it was stopped, and that no one, other than Clegg, was seen to leave or enter it during this time. The inference is permitted, if not compelled, that the four persons who were taken into custody had been present at the burglarized laundromat.

There is no absolute inconsistency between the failure to count or identify the other occupants of the car, and the ability of both officers to identify Clegg as the person who ran out of the laundromat and entered the driver's seat in the car. The claimed deficiencies in the lighting in the area of the laundromat, and the alleged physical impossibility of correlating the testimony concerning the movement of the respective cars of the accused and of the police with the testimony relating to the places where observations were made were matters to be considered by the triers of fact.

 The situation is governed by the recent decision in *People* v. *Roberts* (1967) 256 Cal.App.2d 488 [64 Cal.Rptr. 70], where this court said: "We are bound on this appeal by the well-known rule expressed in *People* v. *Daugherty,* 40 Cal. 2d 876, 885 [256 P.2d 911], as follows: 'The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt.' . The direct eyewitness testimony here of the two officers must be deemed substantial evidence. [Citations.] Their credibility was for the jury to determine. [Citations.]" 256 Cal.App.2d at p. 491. See also *People* v. *Scott* (1963) 218 Cal.App.2d 118, 119-120 [31 Cal. Rptr. 925] ; and *People* v. *Martinez* (1962) 206 Cal.App.2d 809, 812-813 [23 Cal.Rptr. 897].)

Similar considerations apply to the argument that the absence of proof of the exact amount taken from each coin machine in the laundromat, and an alleged inconsistency in the testimony concerning the number of dimes on the person of Clegg render the evidence that he had in his possession the same number of dimes that were missing from the soap machine bereft of all probative value.

 Defendants further complain that there was no evidence to connect the tools in the car with the entry into the

laundromat. The prosecution produced photographs depicting the damage to the door and to three coin machines. It was not necessary to introduce expert testimony to show that the tools inflicted the marks on the damaged property. The tools were admissible if they were reasonably adapted to the performance of the entry which was effected. (*People* v. *Wilson* (1965) 238 Cal.App.2d 447, 463 [48 Cal.Rptr. 55]; and see *People* v. *Gautt* (1961) 190 Cal.App.2d 355, 357 [11 Cal.Rptr. 805].)[2]

The defendant Adams additionally relies on the following principle: "Neither presence at the scene of the crime, nor failure to take steps to attempt to prevent a crime, establish that a person is an aider or abettor." (*Pinell* v. *Superior Court* (1965) 232 Cal.App.2d 284, 287 [42 Cal.Rptr. 676]. *Accord*: *People* v. *Garcia, supra*, 201 Cal.App.2d 589, 594; and *People* v. *Lee* (1962) 202 Cal.App.2d 36, 40 [20 Cal.Rptr. 360].) The courts, however, have uniformly recognized and applied the following rule: " 'The presence of one at the commission of a felony by another is evidence to be considered in determining whether or not he was guilty of aiding and abetting; and it has also been held that presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred. [Citations.]' " (*People* v. *Moore* (1953) 120 Cal.App.2d 303, 306 [260 P.2d 1011]. *Accord*: *People* v. *Belenger* (1963) 222 Cal.App.2d 159, 165 [34 Cal.Rptr. 918]; and *People* v. *Eskew* (1962) 206 Cal.App.2d 205, 207 [23 Cal.Rptr. 466]; and see *People* v. *Villegas* (1963) 213 Cal. App.2d 63, 66 [28 Cal.Rptr. 546]; *People* v. *Navarro* (1963) 212 Cal.App.2d 299, 304 [27 Cal.Rptr. 716]; *People* v. *Ketchum* (1960) 185 Cal.App.2d 615, 619 [8 Cal.Rptr. 607]; *People* v. *Maudlin* (1960) 181 Cal.App.2d 184, 189 [5 Cal. Rptr. 243]; *People* v. *Carlson* (1960) 177 Cal.App.2d 201, 205-206 [2 Cal.Rptr. 117]; *People* v. *Beaulieu* (1956) 144 Cal. App.2d 536, 540 [301 P.2d 304]; and *People* v. *Jaggers* (1932) 120 Cal.App. 733, 734-736 [8 P.2d 206].)

The jury did not have to accept the impeached testimony of the "Sleeping Beauty" that her "Prince Charming" was likewise asleep (see *People* v. *Beaulieu, supra*, 144 Cal.App.2d 536, 540)—an observation she was hardly quali-

---

[2]The prosecutor's assertion that the damage depicted could have been inflicted with the tools in question went unchallenged, except for argument that other types of tools, as well, could have accomplished the same result.

fied to make if she herself was under the spell of Morpheus. Her testimony revealed that Adams and Clegg had been traveling together, with the girls, for three weeks. It cannot seriously be contended that Adams was not in the car when Clegg was observed leaving the laundromat and driving the car away. The evidence, which shows that a coffee machine, activated by nickels and dimes, and a hair dryer, activated by quarters, were broken into, permits an inference that some coins were obtained from those sources, despite the inability of the laundromat owner to testify as to their contents at the time the laundromat was closed the previous evening. If the dimes found on Clegg be deemed limited to that obtained from the soap machine, Adams may be deemed to have gleaned the quarters, dimes and nickels, which he possessed, from the other machines. (See *People* v. *Citrino* (1956) 46 Cal.2d 284, 288 [294 P.2d 32].) He was placed in the car in a position where he could not only observe, but also could exercise dominion and control over the tools. (See *People* v. *Wilson, supra,* 238 Cal.App.2d 447, 461-464; and *People* v. *Gautt, supra,* 190 Cal.App.2d 355, 357.)

The following observations from *People* v. *Moore, supra,* are pertinent: ''Appellant was not a mere bystander or onlooker. He may have committed no overt act during the robbery but none was required. His presence could have given encouragement to his companions and acted as a deterrent to any continued resistance on the part of Lopez. He was in the position of a lookout and though he gave no warning none was required. He was in the company of the other defendants before the crime was committed, remained with them during the robbery, fled with them from the hotel, and when arrested in company with the others had the knife and stolen bills in his possession. That is sufficient to make him a participant in the crime.'' (120 Cal.App.2d 303, 306; and see cases cited above for examples of circumstances, which together with physical presence at the scene, sustain a finding of guilt.)

Defendants have attempted to unravel the strands of the rope on which the prosecution has suspended the case for their guilt in order to show that each strand alone is insufficient to support that weight. While neither presence, nor possession of stolen property, nor possession of instruments adapted to forcing the entrance, of itself may be sufficient to convict, the combined circumstances sustain the verdicts.

''It should . . . be borne in mind in passing on the sufficiency of the evidence to sustain a conviction that, before a reversal may be had, it must be made clearly to appear that

upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

We must assume in support of the judgment the existence of every fact which the trial court could have reasonably deduced from the evidence, and then determine whether the facts 'justify the inference of guilt.' (*People* v. *Deysher,* 2 Cal.2d 141, 149 [40 P.2d 259].) If the circumstances reasonably justify the determination of the trier of fact, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant a reversal. (*People* v. *Newland, supra*; *People* v. *Gould,* 111 Cal.App.2d 1 [243 P.2d 809].)'' (*People* v. *Frankfort* (1952) 114 Cal.App.2d 680, 689 [251 P.2d 401] ; and in addition to the cases cited see *People* v. *Hall, supra,* 62 Cal.2d 104, 110; *People* v. *Scott, supra,* 218 Cal.App.2d 118, 119 ; *People* v. *Villegas, supra,* 213 Cal.App. 2d 63, 66 ; *People* v. *Martinez, supra,* 206 Cal.App.2d 809, 813 *People* v. *Lee, supra,* 202 Cal.App.2d 36, 39-40 ; *People* v. *Ketchum, supra,* 185 Cal.App.2d 615, 618; *People* v. *Beaulieu, supra,* 144 Cal.App.2d 536, 539-540; and *People* v. *Moore, supra,* 120 Cal.App.2d 303, 306.)

Adams also asserts that he was incapable of committing the burglary because he fell within the class of '' [P]ersons . . . who committed the act . . . charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused.'' (Pen. Code, § 26, subd. Eight.) This contention is predicated upon a statement in the extrajudicial statement of the impeached witness indicating that Clegg threatened Adams. As is hereinafter pointed out, this statement was never received for the truth of the matter stated. The issue of threat or menace was never presented in the trial court, and, on the record in this case, may not be raised here for the first time. (See *People* v. *Franklin* (1962) 202 Cal.App.2d 528, 533 [21 Cal.Rptr. 29] ; and *People* v. *McNally* (1955) 134 Cal. App.2d 410, 412 [285 P.2d 716].) Furthermore, even if the facts relied upon were established by competent evidence, the asserted incapacity could be disregarded in the light of the whole record. (See *People* v. *Belenger, supra,* 222 Cal.App.2d 159, 166 ; *People* v. *Carlson, supra,* 177 Cal.App.2d 201, 204; and *People* v. *Sierra* (1953) 115 Cal.App.2d 498, 500 [252 P.2d 394].)

*Impeachment of the Witness*

The defendants' women companions were not only arrested with the defendants on August 14th, but were also held to answer and were jointly charged in the information which was filed on September 27, 1966. From proceedings held outside the presence of the jury and from the testimony of Miss Poole, it appears that they originally stated to the authorities that they were asleep at the time the burglary was allegedly committed; that thereafter they asked to see the deputy district attorney and as a result met with him in the presence of their counsel, the public defender (who thereafter terminated his representation of the defendant Adams); and that the women gave a reported statement in which Miss Poole was the principal declarant. In that statement the women claimed that they had previously falsely said they were asleep, at the suggestion of the defendants; they described the environs of the laundromat; and they narrated the actions of the defendants in detail.[3] On the same day, October 20, 1966, the proceedings were dismissed as to the two women.

---

[3]The parts of the statement relating to the burglary, which were read to the jury, are as follows: ''Q. What kind of a place was this? A. It was a laundromat and a beauty shop on one side and a store, I think it was a store on the other side. Q. Okay. A. And Jim got out and he went over to the door and he stood by the telephone while a car went by, acting like he was talking on the telephone, and when the car went by he put the phone back on the hook. Q. That would be Mr. James Adams? A. Yes, sir. Q. And were you awake at this time? A. Yes, sir. Q. And you observed this? A. Um hum. Q. Did you also observe this, Miss Wizner?''

Miss Wizner's answer, ''Yes, sir. Q. All right. Then what happened when he hung up the phone?''

Miss Poole's answer, ''He went back over to the door, he looked in it and he came back over and told Donald it was all right—it was right inside the door, and—— Q. Did he say what was right inside the door? A. Yes, sir. Q. Okay. A. So Donald got out, too. Q. Donald would be—— A. Mr. Clegg. Miss Wizner: Mr. Clegg. . . .''

(Reading) ''Now, so both Mr. Adams and Mr. Clegg are out of the car. Are you watching this all the time? Miss Poole: Well, Mr. Clegg turned the car around first and put the car back up towards the door. Q. Back up towards the door? A. Yes. Q. That the door of the laundromat? A. Yes, sir. And before he got out he said 'What are you going to do, Donald,' and he said 'It's none of your business, lie down, shut up, or else I'll give you what you got before,' and then he says 'If you don't like it you can get out,' and then he said, then he said, 'If you do I'll get you before you get ten feet from the car,' so he took the keys and he went on in. Q. Okay. What did Mr. Clegg and Mr. Adams do after they were both out of the car? A. They broke the door open. . . . Q. How did they do that? A. I don't know. They had something to do with it, I don't know what it was. I know they threw something out of a window before the police pulled us over. Q. They broke the door down to the laundromat? A. Yes, sir. Q. And did they go inside? A. Yes, sir. Q. How long were they in there? A. Well, Mr. Adams stood at the window looking out and Mr. Clegg, well, he helped Mr. Clegg try to take

On November 1st, the second day of trial, in a session outside the presence of the jury, the attorney for Clegg indicated that he had reviewed the written statement with the women and they had told him that they repudiated at least portions of the statement and would not testify in accordance with it. He requested and was granted permission to pursue the matter outside the presence of the jury in the event either woman was called as a witness, repudiated her statement, and was then to be subjected to impeachment by use of the statement.

Miss Poole, who had been riding in the rear seat with Adams, was called as a witness by the prosecution. She testified briefly concerning their joint trip and the arrest. An objection was sustained to the question, ''What were the events leading up to this arrest?'' which had elicited the answer, ''I don't know.'' She then testified that the preceding Monday, October 24th, was the first time she was at the location of the laundromat. The jurors were then excused and the court heard testimony from the witness, from the deputy district attorney, and from the attorney for Clegg, and argument on the issue of using the statement to impeach the witness. The statement itself was received for the court's perusal only.

It was established on behalf of the defendants that their attorneys had advised the deputy district attorney, on the morning of the first day of the trial, that the women had repudiated their statements; that in the event they should be called to testify, their testimony would be contrary to the statements which they had previously given him; and that the defendants would object to any claim of surprise. The defendants also brought out that the prosecutor had not reinterviewed the women since he had been so advised.

The prosecution brought out that the women were first interviewed by defense counsel on October 24th; that on October 28th, the Friday before trial, defense counsel had advised the women that they could change motels, and that they did not have to talk to the prosecutor; and that after learning the

off one of the machines off the wall and I don't know how long they were in there. It just happened so fast. Q. You saw one of them trying to take the machine off the wall or both of them? A. Yes, sir. Well, both of them. Well, it was right next to the window and they were trying to take it and then. Q. ——(Interrupting) I see. A. Evidently they couldn't get it so Mr. Adams looked out the window and Mr. Clegg did something else, I couldn't see what it was. Q. What happened when they left the laundromat? A. They took off like a streak of lightning and they went on down the exit of the entrance of the highway. Q. Who was driving? A. Mr. Clegg.''

120

women were being sought, counsel for defendant Clegg advised them to surrender themselves. The women did come to the prosecutor's office, and told him that they would honor the subpoenas, which had been served on them on October 20th when they were released, that one of the defense attorneys had advised them not to talk, and that they would "tell the truth." The prosecutor could not honestly say whether or not he had any idea that they were going to change their story, but acknowledged that he had certain doubts about their testimony. He told defense counsel on Monday that he would claim surprise if the testimony did not coincide with "the truth" as related in the statements.

The court ruled that the statement could be used for the limited purpose of testing the credibility of the witness under a proper instruction. Subsequently, the court rejected, as untimely, an offer to present testimony of the women that the prosecutor was advised on October 28th that they would testify they were asleep at the time of the alleged offense.

When recalled, the witness repeated her testimony that she had not been to the laundromat other than the preceding Monday (October 24th). She stated she had never seen any of her companions at the laundromat, or either of the defendants inside those premises. She did not recall ever having been stopped there in the Pontiac, and denied that she saw either of the defendants break the door open. She acknowledged that she had given the statement October 20th. Thereupon, after an instruction from the court, some of the contents of the statement were read into the record. (See fn. 3, *supra*, and accompanying text.)

The witness acknowledged that she had given the statement, but she averred that the statement was given in return for the prosecutor's promise that the women would be released, and because she was led to believe that Adams was unfaithful to her; and that, in truth she was asleep, and did not know whether the car stopped at the laundromat or not. She also testified, as indicated in the statement of facts, that she probably would have awakened if the car had rushed off, that Adams was likewise asleep, and that the tools were used to repair the car. Her familiarity with the scene was explained by information received from fellow jail inmates, and from what she had heard at the preliminary examination.

■ The requirements, prior to the effective date, January 1, 1967, of the Evidence Code[4] for the impeachment of a party's own witness, have been tersely set forth as follows: ''To permit impeachment of one's own witness in this state, three elements must exist: (1) damage to the party calling the witness; (2) materiality of the evidence; and (3) surprise at his present testimony. [Citations.]'' (*People* v. *Pickens* (1961) 190 Cal.App.2d 138, 147 [11 Cal.Rptr. 795]. *Accord*: *People* v. *Miller* (1966) 245 Cal.App.2d 112, 135 [53 Cal.Rptr. 720] [overruled on other grounds *People* v. *Doherty* (1967) 67 Cal.2d 9, 15 [59 Cal.Rptr. 857, 429 P.2d 177]]; and *People* v. *Howard* (1964) 226 Cal.App.2d 281 [37 Cal.Rptr. 918]; and see Code Civ. Proc., former §§ 2049 and 2052.)

■ The controversy in this case has revolved about the question of whether the prosecution properly established the element of surprise. The imposition of this requirement has been criticized (see *People* v. *Kidd* (1961) 56 Cal.2d 759, 766 [16 Cal.Rptr. 793, 366 P.2d 49]; *People* v. *Spinosa* (1953) 115 Cal.App.2d 659, 668 [252 P.2d 409]; and *Sandoval* v. *Southern Cal. Enterprises, Inc.* (1950) 98 Cal.App.2d 240, 245 [219 P.2d 928]), and has now been abrogated for all original trials or new trials commencing after December 31, 1966. (Evid. Code, § 12, and see fn. 4, *supra*.) The People contend that this change in the law renders the question moot, because on

---

[4]Section 785 of the Evidence Code provides: ''The credibility of a witness may be attacked or supported by any party, including the party calling him.''

Section 780 states in part: ''Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: . . . (h) A statement made by him that is inconsistent with any part of his testimony at the hearing.''

Section 1235 provides: ''Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770.''

Section 770 provides: ''Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or (b) The witness has not been excused from giving further testimony in the action.''

See also sections 768 and 769.

For general comment see Legislative Committee and Law Revision Commission Comments on foregoing sections; Miller, *Beyond the Law of Evidence*, 40 So.Cal.L.Rev. (1967) 1, 19-21; McDonough, *The California Evidence Code: A Précis*, 18 Hastings L.J. (1966) 89, 111-112; and Witkin, Cal. Evidence (2d ed. 1966) §§ 537-539, 1249-1257 and 1270-1272, pp. 510-512, 1151-1161 and 1176-1179.

retrial the witness' inconsistent statement would be admissible without any showing of surprise. Nevertheless, since other considerations, hereinafter noted, might preclude use of the statement, the propriety of the court's action in permitting the use of the statement under the law applicable at the time of the trial is examined.

There can be no surprise where the witness testifies in accordance with his sworn testimony at a prior trial (*People* v. *Hamilton* (1963) 60 Cal.2d 105, 114-116 [32 Cal.Rptr. 4, 383 P.2d 412] [overruled on other grounds *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]]), or at a prior deposition (*Sandoval* v. *Southern Cal. Enterprises, Inc., supra,* 98 Cal.App.2d 240, 245-246). On the other hand, surprise is shown where the witness testifies contrary to the express testimony given at an earlier hearing before a coroner's jury, or magistrate (*People* v. *Page* (1938) 28 Cal.App.2d 642, 647 [83 P.2d 77]) ; or where he testifies contrary to his last testimony under oath, although in conformance with earlier testimony which had apparently been recanted (*People* v. *Spinosa, supra,* 115 Cal.App.2d 659, 668-669). Other cases have found surprise where the witness fails to testify in accordance with an alleged prior statement to the press (*People* v. *Kidd, supra,* 56 Cal.2d 759, 766-767), or with a reported statement to police officers. (*People* v. *Miller, supra,* 245 Cal.App.2d 112, 135; *People* v. *Howard, supra,* 226 Cal.App.2d 281, 288; *People* v. *Pickens, supra,* 190 Cal. App.2d 138, 146; and *People* v. *Jaggers, supra,* 120 Cal.App. 733, 736.)

Defendants seek to avoid the impact of the latter cases, on the ground that they gave the prosecutor notice of the prospective witnesses' repudiation of their testimony, and because the prosecutor failed to reinterview the women after being so advised. The prosecutor is not bound to accept the representation of his adversary as to what the prospective witness will in fact testify to when sworn. (*People* v. *Page, supra,* 28 Cal.App.2d 642, 648.) Nor is he required to reinterview the witness before trial. (*People* v. *Miller, supra,* 245 Cal.App.2d 112, 135.) Where there are conflicting extrajudicial statements which are not under oath, neither side can be absolutely sure of what the witness will ultimately state when sworn In this situation the prosecution properly may deem it advisable to call the witness so that the jurors may be fully informed. If the testimony proves adverse, the opportunity to impeach it should not be denied, and surprise may properly be claimed.

Moreover, it is generally recognized: "Trial courts should be liberal in permitting such impeachment, and doubts should be resolved in favor of allowing the testimony. (*People* v. *Spinosa, supra,* 115 Cal.App.2d 659, 668.)" (*People* v. *Kidd, supra,* 56 Cal.2d 759, 766; and in addition to the case cited, see *People* v. *Miller, supra,* 245 Cal.App.2d 112, 135; *People* v. *Howard, supra,* 226 Cal.App.2d 281, 287-288; *Sandoval* v. *Southern Cal. Enterprises, Inc., supra,* 98 Cal.2d 240, 245; and *People* v. *Jaggers, supra,* 120 Cal.App. 733, 738.)

▮ No error is found in the court's ruling on the issue of surprise.

While in pursuit of the hare, the hounds may have overlooked the scent of a more productive trail. In *People* v. *Newson* (1951) 37 Cal.2d 34 [230 P.2d 618], the court observed as follows: "[T]he prior statements inconsistent with the witness' present testimony can only be considered for the purpose of neutralizing and counteracting the effect of his statements upon the trial.

"The purpose of the statute is to allow a party to wipe out, as nearly as possible, the evidence which has been given. Where a witness states no fact against the party calling him, there is nothing to counteract. The testimony which may be contradicted must be prejudicial and detrimental, otherwise the previous statement shown would stand out, not as offsetting contrary testimony already given, but as substantive evidence of a fact." (37 Cal.2d at p. 41.) ▮ A distinction between proper impeachment and an improper attempt to get extrajudicial statements before the jury has been generally recognized. "The impeaching statements were evidently desired as evidence. If such testimony were admissible, it would be easy to manufacture evidence of that kind. If a witness merely fails to testify as expected, that does not authorize the party calling him to prove that the witness had elsewhere made the desired statements. It is only when he has given damaging testimony that he can be impeached. (*People* v. *Jacobs,* 49 Cal. 384.)" (*People* v. *Mitchell* (1892) 94 Cal. 550, 556 [29 P. 1106]. *Accord: People* v. *Hamilton, supra,* 60 Cal.2d 105, 115; *People* v. *Newson, supra,* 37 Cal.2d 34, 42-44; and see *People* v. *Flores* (1940) 37 Cal.App.2d 282, 287-288 [99 P.2d 326].) On the other hand, in recognizing these rules, the cases have pointed out that a denial, or negative testimony, may nevertheless be material and damaging. (*People* v. *LeBeau* (1952) 39 Cal.2d 146, 148-149 [245 P.2d 302]; *People* v. *Howard, supra,* 226 Cal.App.2d 281, 288; *People* v. *Spin-*

124

*osa, supra,* 115 Cal.App.2d 659, 665-668; and *People* v. *Jaggers, supra,* 120 Cal.App. 733, 737-738.)

 It is noted that following the witness' impeachment, on the first direct examination, and upon cross-examination, the witness qualified her testimony and stated, not that she had never been to the scene before, but that she was asleep at the time of the alleged offense and did not know whether or not the car had stopped at the laundromat. If the witness had first so testified, and so limited her testimony, there would have been no prejudice to the prosecution, and the principles enunciated in *Newson* and *Flores* would apply.[5]

However, the posture of the case at the time the prosecution sought to impeach the witness showed damage to the prosecution. She had testified unequivocally that she was traveling with the defendants and their other female companion, and that she had not been to the scene of the burglary until October 24th. The foregoing warranted the trial court's conclusion, phrased as follows: "She gave a damaging statement in that she said that she hadn't been to this place before, which might indicate to the jury that none of these people had been at this laundromat." On this state of the record, all of the elements required by the prior law had been met, and there was no error in permitting the use of the inconsistent statement for impeachment.

 At the time the statement was read to the witness the jurors were instructed of the limited use for which the contents were received; and at the conclusion of the case they were cautioned in language similar to that found in CALJIC Instruction No. 54-A, as approved prior to the effective date of the Evidence Code.

Even if the misunderstanding of the nature of the testimony of the witness be deemed to make the reception of the impeaching statement an error, no prejudice has been shown. The jurors were properly and clearly instructed to disregard the content of the statement in determining the question of guilt. The other evidence, which was not controverted, pointed unmistakably to the guilt of defendants. (See *People* v. *Jaggers, supra,* 120 Cal.App. 733, 738.)

The judgments are affirmed.

---

[5]It is unnecessary to determine to what extent, if any, the rule of *Newson* is affected by the adoption of the Evidence Code (see fn. 4, *supra*). See, however, Law Revision Commission Comment in section 1235; Witkin, Cal. Evidence (2d ed. 1966) § 1272, p. 1178; and note *Douglas* v. *Alabama* (1965) 380 U.S. 415, 419 [13 L.Ed.2d 934, 85 S.Ct. 1074].)

Molinari, P. J., and Elkington, J., concurred.

On March 15, 1968, the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied April 17, 1968.